WAYNE A. SILVER, Esq. (CA 108135)
333 West El Camino Real, Suite 310
Sunnyvale, California 94087
Email: w_silver@sbcglobal.net
Tel. (408) 720-7007
Fax. (408) 720-7001
(*Admitted Pro Hac Vice*)

LAW OFFICES OF AMY N. TIRRE
Amy N. Tirre, Esq. (NV 6523)
3715 Lakeside Dr., Suite "A"
Reno, NV 89509
Email: amy@amytirrelaw.com
Tel. (775) 828-0909
Fax. (775) 828-0914

Attorneys for Plaintiff,
KENMARK VENTURES, LLC

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ANTHONY THOMAS and WENDI THOMAS,<br><br>AT EMERALD, LLC,<br><br>            Debtors. | Case No. BK-N-14-50333-BTB<br>Case No. BK-N-14-50331-BTB<br><br>Chapter 7<br><br>[Jointly Administered] |
| KENMARK VENTURES, LLC<br><br>            Plaintiff,<br>     v.<br>ANTHONY THOMAS and WENDI THOMAS,<br><br>            Defendants. | Adv. Pro. No. 14-5022<br><br>**Trial Date::**  **November 9, 2015**<br>      Time:  9:00 a.m.<br>  Courtroom:  Two |

### KENMARK VENTURES, LLC'S SUPPLEMENT
### TO REQUEST FOR JUDICIAL NOTICE

     KENMARK VENTURES, LLC ("Kenmark"), Plaintiff in the above-captioned Adversary

Proceeding No. 14-5022 and a creditor in Chapter 7 case No. BK-N-14-50333-BTB of Debtor and

Defendant ANTHONY THOMAS ("Thomas"), supplements its Request for Judicial Notice as

follows:

| Exhibit | Description | Pages |
|---------|-------------|-------|
| Eleven | Decisions and Judgment in *Conetto v. Morrison*, Los Angeles Superior Court Case No. BS118649: | |
| | • Tentative Decision and Statement of Decision Following Trial of Claim by Anthony and Wendi Thomas filed January 29, 2014. | 228 – 262 |
| | • Tentative Decision and Statement of Decision Following Trial of Claims by the Morrison Parties filed May 28, 2015. | 263 – 276 |
| | • Judgment filed June 23, 2015 | 277 – 278 |

Dated:  October 30, 2015

/s/ Wayne A. Silver
Wayne A. Silver, attorney for
Plaintiff, KENMARK VENTURES,
LLC

Kenmark Ventures, LLC's Supplement to Request for Judicial Notice

1

### CERTIFICATE OF SERVICE

2       I served the foregoing KENMARK VENTURES, LLC'S SUPPLEMENT TO REQUEST FOR

3  JUDICIAL NOTICE by the following means on October 30, 2015 to the persons listed below:

4   __XX__   Electronic mail, by transmitting a true copy thereof to the following:

5

| Name | Email Address |
|------|---------------|
| Jeffrey Cogan, Esq. | Jeffrey@jeffreycogan.com |

6

7       I declare under penalty of perjury that the foregoing is true and correct. Signed this 30th day of

8  October, 2015 at Sunnyvale, CA.

9                                         /s/ Wayne A. Silver
                                          Wayne A. Silver

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Kenmark Ventures, LLC's Request for Judicial Notice

# SUPPLEMENTAL EXHIBIT TO KENMARK REQUEST FOR JUDICIAL NOTICE

# RJN EXHIBIT 11

A.     Tentative Decision & Statement of Decision Following Trial of Claim by Anthony & Wendi Thomas

B.     Tentative Decision & Statement of Decision Following Trial of Claim by the Morrison Parties

C.     Judgment

56

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

**FILED**
Superior Court of California
County of Los Angeles

**JAN 2 9 2014**

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Paul Solis

| | |
|---|---|
| KEN CONETTO BY ERICK KITCHEN, HIS ATTORNEY IN FACT, | BS118649 |
| Petitioner, | TENTATIVE DECISION & STATEMENT |
| v. | OF DECISION FOLLOWING TRIAL OF |
| KIT MORRISON AND TODD ARMSTRONG, | CLAIM BY ANTHONY & WENDI |
| Respondents. | THOMAS |
| AND RELATED ACTIONS. | |

Trial in this matter was conducted on October 7-11, 15-18, 21-25, 28-31 and November 1 & 4, 2013 in Department 56 of this Court, Judge Michael Johnson presiding. Intervenors Anthony Thomas and Wendi Thomas were represented by Steven Smith and Mark Kearney. Respondents Kit Morrison and Todd Armstrong were represented by Browne Greene and Andrew Spielberger. Intervenor Mark Downie was represented by Steven Haney. The court has considered all evidence, the briefs and argument of counsel, and it now issues the following decision.

**PROCEDURE**

This is an in rem proceeding to determine ownership of the Bahia Emerald, which is reputedly one of the world's largest and most valuable raw emerald stones. In December 2008 the Los Angeles County Sheriff's Department seized the Bahia Emerald as potentially stolen property, and it has maintained custody of the emerald through the present.

The legal proceedings began on January 14, 2009 when a petition for return of the Bahia Emerald was filed by Kenneth Conetto, by Eric Kitchen as Conetto's attorney in fact. In his

RJN228

1  petition, Conetto alleged that he was the owner of the Bahia Emerald. He named Kit Morrison

2  and Todd Armstrong as respondents, and alleged that they too claimed an ownership interest in

3  the emerald. Conetto petitioned the court to release the Bahia Emerald, alleging that the parties

4  had settled their claims to the emerald and the court should return the emerald to him pursuant to

5  Penal Code §1536.

6       On January 26, 2009 Anthony Thomas responded to the petition by filing a declaration in

7  pro per. In his declaration, Thomas claimed that he was the owner of the Bahia Emerald and

8  asked the court to return the emerald to him.

9       Beginning in spring 2009 a number of parties filed complaints in intervention, asserting

10  ownership interests in the Bahia Emerald and alleging various causes of action against others.

11  Among those who filed complaints in intervention were Anthony and Wendi Thomas, Mark

12  Downie, Larry Biegler, Wayne Catlett, Jerry Ferrara, Dave Fisher, Dave Porter, Gemworks

13  Mining Inc., F&M Holdings Inc. and Market Link Inc.

14       The case was initially assigned to Judge John Kronstadt. After extensive pre-trial

15  proceedings, the case was set for trial beginning in September 2010. Judge Kronstadt ordered

16  bifurcation of each party's ownership claim, reserving other causes of action for later

17  proceedings. Because Thomas' ownership claim occurred earliest in time and involved largely

18  self-contained facts, a separate court trial of the Thomas claim was held first.

19       Trial of the Thomas claim before Judge Kronstadt occupied eight non-consecutive trial

20  days in September 2010 through January 2011. On April 9, 2011 Judge Kronstadt issued a

21  statement of decision that rejected Thomas' ownership claim and ruled in favor of the other

22  parties. A few days after issuing the decision, Judge Kronstadt left the Superior Court and

23  became a federal judge. The case was then assigned to this court, and Thomas moved for an

24  order declaring a mistrial and striking Judge Kronstadt's decision. On January 27, 2012 the court

25  granted the motion, based upon the well-settled principle that (unless the parties stipulate

26  otherwise) a mistrial must be granted when the judge who conducted the first phase of a

27  bifurcated court trial is no longer available to hear subsequent phases of the trial. E.g.

28

Decision following Trial

1  | Guardianship of Sullivan (1904) 143 Cal. 462, 467; European Beverage v. Superior Ct. (1996)

2  | 43 Cal.App.4th 1211, 1214-15; Rose v. Boydston (1981) 122 Cal.App.3d 92, 97.

3  | Following additional pre-trial proceedings, the case was set for re-trial beginning in

4  | October 2013. By that time only three sets of parties asserted ownership interests in the Bahia

5  | Emerald: Intervenors Anthony and Wendi Thomas, Intervenor Mark Downie, and Respondents

6  | Kit Morrison and Todd Armstrong. After re-examining the issue, the court again ordered

7  | bifurcation of Thomas' cause of action for recovery and possession of the Bahia Emerald,

8  | reserving Thomas' other causes of action and the ownership claims of the other parties for later

9  | proceedings.

10 | The court proceeded to trial under the guidance of the quiet title standards of Code Civ.

11 | Proc. §§760.010 et seq.  Section 760.020(a) authorizes an action "to establish title against

12 | adverse claims to real or personal property."  A claim to property is "a legal or equitable right,

13 | title, estate, lien, or interest in property or cloud upon title." §760.010(a). In a quiet title action,

14 | the court "shall examine into and determine the plaintiff's title against the claims of all the

15 | defendants." §764.010.  See also 5 Witkin Cal. Procedure (5th ed.) Pleading §653 (An action to

16 | quiet title "is used to assert a wide range of interests against an equally wide range of adverse

17 | claims. It is available to establish any kind of title or interest, legal or equitable, real or personal

18 | property.").

19 | The court heard evidence during 20 days of trial. The parties presented testimony by 26

20 | witnesses and they introduced 144 exhibits into evidence. Counsel presented oral argument at the

21 | conclusion of the evidence, and they later submitted two sets of written post-trial briefs.

22 | **FACTS**

23 | The court has carefully reviewed all of the evidence and argument presented by the

24 | parties. The court has weighed the evidence, resolved conflicting evidence, and has drawn

25 | appropriate inferences from the evidence. The following summary describes the court's findings

26 | on the principal issues of fact, and for purposes of clarity it also highlights some of the contrary

27 | contentions which the court has rejected.

28 |

Decision following Trial

3

## Bahia Emerald and Renata Joias

The Bahia Emerald is a solid black schist with nine protruding emerald crystals. It weighs 341 kilograms (751.77 pounds)[*]; its base measures 760 by 670 millimeters (29.92 by 26.38 inches); and its irregular height ranges from 500 to 850 millimeters (19.69 to 33.46 inches). It was discovered and mined on July 9, 2001 in the Pindobacu Municipality, State of Bahia, Nation of Brazil, by employees of Renata Joias Embalagens Ltda. ("Renata Joias").

Elson Alves Ribeiro is the majority owner and managing director of Renata Joias. He has extensive experience in the mining industry and has spent most of his life mining, buying and selling emeralds, diamonds and similar stones. Renata Joias is a family-owned mining company based in Limeira, Brazil, and Ribeiro generally consults with his family members regarding major decisions. Ribeiro's native language is Portuguese; he is not fluent in English and he used a translator during his testimony. (During the trial, Ribeiro was referred to as "Elson," "Ribeiro," and one of "the Brazilians." In this decision, he will be called "Ribeiro.")

Ruy Saraiva Filho is a key employee of Renata Joias. He has worked with the company since 1987, and he essentially operates as Ribeiro's close assistant. Like Ribeiro, Saraiva has spent most of his life mining, buying and selling emeralds, diamonds and similar stones. His native language is Portuguese; he is largely fluent in English but used a translator during his testimony. (During the trial, Saraiva was referred to as "Ruy," "Saraiva," "Filho," and one of "the Brazilians." In this decision, he will be called "Saraiva.")

Ribeiro and Saraiva have known and done business with Kenneth Conetto since the 1980s. Conetto is a mining consultant who lives in northern California. Over the past 25 years he has traveled regularly to Brazil (2-3 trips a year) and has worked with Ribeiro and Saraiva on various mining projects. He considers them friends as well as business associates.

---

[*] Some of the appraisals convert the weight from 341 kilograms to 840 pounds, but this is the wrong conversion. 1 kilogram equals 2.2046 pounds; 341 kilograms equal 751.7686 pounds.

**Meetings in Spring and Summer 2001**

In 2001 Ribeiro and Saraiva were traveling in the United States, selling emeralds and conducting other business. They visited Conetto in northern California, and he introduced them to people who might be interested in buying emeralds.

One of the people that Ribeiro and Saraiva met through Conetto was Anthony Thomas. Thomas is a licensed building contractor, who lived in northern California during all relevant times. Thomas owned and operated T&D Construction from approximately 1987 to 2007. His firm specialized in underground construction work and drilling, such as the installation of utility conduits and cables. Thomas met Conetto because of his interest in directional drilling, which is one of Conetto's specialties. Thomas has no experience with mining or with emeralds or other precious stones.

Thomas referred and introduced Ribeiro and Saraiva to jewelers and others who might purchase emeralds or engage in other business transactions. One of the people that Ribeiro and Saraiva met through Thomas was Martin Garcia. On June 22, 2001 they sold Garcia $35,000 in emeralds and gems. Garcia wanted a receipt, and he provided Ribeiro and Saraiva with a blank form which they filled out for him. It was a standard bill of sale form in English, copyrighted by E-Z Legal Forms [Ex 2]. The blank forms are readily available for purchase in the United States [Ex 3]. Ribeiro and Saraiva did not use this form before or after the transaction with Garcia. They have their own bill of sale form which they use for transactions in Brazil.

Another person that Thomas introduced to Ribeiro and Saraiva was Wayne Catlett. Catlett has a background in computers and technology. He worked for IBM, and he then operated more than a dozen companies of his own in the field of computer software, hardware and high technology products. In 2001 Catlett was CEO and majority shareholder of Digital Reflections Inc. ("DRI"), a start-up company in northern California engaged in the development of digital imaging technology. Thomas invested heavily in DRI, putting over $200,000 into the company from 1999 to 2001. Thomas also encouraged his family to invest in DRI, and they put close to $1 million into the company during the same period of time. Thomas was closely involved with Catlett in DRI's business activities.

**Development of the DRI Financing Scheme**

In 2001 DRI was in dire financial condition. The company had no income and was not meeting its current expenses; it had not paid its employees for more than six months. DRI had exhausted all available sources of capital, and it looked like the company would go under. On July 1, 2001 Thomas loaned $75,000 to DRI and received a promissory note payable on December 31, 2001 or upon DRI raising $500,000 in capital (whichever occurred first) [Ex 188].

Someone in DRI's management group became aware of a potential source of non-traditional funding that could meet the company's urgent financial needs:  a "high-yield investment program" through the International Chamber of Commerce. As described by Joy Mackell, a DRI consultant, the program required an initial contribution of $100 million, which would be invested at an extraordinarily high rate of return. Within a short time, the participant would receive the original contribution plus a return of approximately $100 million. This "high-yield investment program" (which was never completely described in the evidence) was viewed by the DRI group as their last resort.

In order to participate in the high-yield investment program DRI needed the initial contribution of $100 million, which the company of course did not have. Someone in the DRI management group developed the idea of borrowing $100 million, using valuable collateral to secure the loan. That is how Ribeiro and Saraiva came together with DRI, Catlett and Thomas: DRI would use Brazilian emeralds as collateral for the $100 million loan that was required for entry into the high-yield investment program.

Over the course of several meetings held during the summer of 2001, Catlett, Thomas and the others at DRI came up with the plan that would enable DRI to continue to operate and avoid the loss of the massive investments that Thomas, Catlett  and others had made in the company:  Ribeiro and Saraiva would furnish DRI with $25 million in cut and polished emeralds; DRI would use the emeralds as collateral for a $100 million loan; proceeds from the loan would be invested in the high-yield investment program; and the super-high returns from the program would be used to repay the loan and fund DRI's business operations. In return for their participation, Ribeiro and Saraiva would be reimbursed up to $3.375 million for their

1    expenses; Thomas and others would receive very large commissions from DRI's high-yield

2    investment program returns; and Thomas, Conetto, Ribeiro and Saraiva would share exclusive

3    rights to distribute DRI's products and technology in South America.

4        By late summer 2001, the parties agreed to these terms, and Ribeiro and Saraiva returned

5    to Brazil to collect $25 million in cut and polished emeralds for use in DRI's financing scheme.

6    Thomas was the principal DRI contact for Ribeiro and Saraiva. In Brazil, Ribeiro and Saraiva

7    gathered emeralds from their own mines and purchased emeralds from other mines in Brazil.

8    They and their company Renata Joias incurred substantial expense for these activities and for

9    having the emeralds cut, polished and appraised. Thomas agreed to reimburse Ribeiro and

10   Saraiva for their expenses until DRI could arrange funding of the loan that would be secured by

11   the emeralds.

12       On August 27, 2001 Thomas wired $6,000 to Ribeiro's bank account in Miami Florida

13   [Ex 4]. The money was paid against Ribeiro's costs for collecting cut and polished emeralds

14   under the DRI financing scheme that the parties had agreed to. There is nothing in writing which

15   describes or confirms the purpose of this wire transfer. Thomas did not send Ribeiro or Saraiva

16   any kind of letter, email or fax, and he left the "purpose" line of the wire transfer form blank.

17   Thomas testified that he paid the money for emerald statues and other items that he purchased

18   from Ribeiro and Saraiva, and not for their DRI-related costs. The court has rejected this

19   testimony; it is not credible.

20       On September 13, 2001 Thomas and Catlett entered into a written agreement that

21   confirmed some aspects of the DRI financing scheme that the parties had orally agreed to earlier

22   in the summer [Ex 356]. The agreement, entitled "Emeralds Interim Purchase Agreement," is

23   between Catlett's entity Tradewinds Investment Group Ltd ("TIG") and the "Brazilian Group,"

24   identified as Thomas and Conetto. The agreement provides for the purchase of $25 million in cut

25   and polished emeralds, title to be jointly held by TIG and the Brazilian Group. The Brazilian

26   Group was to acquire the emeralds, and TIG agreed to repay the Brazilian Group for its costs (up

27   to a maximum of $3.375 million) through a promissory note payable not later than 60 days after

28   the emeralds were deposited with a bank in Brazil. TIG also agreed to pay the Brazilian Group

Decision following Trial

7

RJN234

1   $3 million in compensation, payable $100,000 per month beginning 60 days from depositing the

2   emeralds, and pay Thomas a commission of 10 percent of the proceeds received by DRI from the

3   high-yield investment program (about $10 million), half in cash and half in DRI stock. TIG also

4   promised that the Brazilian Group would receive exclusive rights to distribute DRI technologies

5   in South America. The document is described as an "interim" agreement and "summary," that

6   would be followed by a "definitive" agreement at a later date.

7       The TIG interim purchase agreement is consistent with the terms that Catlett, Thomas,

8   Conetto, Ribeiro and Saraiva agreed to during the summer of 2001. It confirms Ribeiro and

9   Saraiva's understanding that Thomas was responsible for paying the expenses they incurred in

10  collecting cut and polished emeralds until DRI could arrange funding of the loan that would be

11  secured by their emeralds. Thomas testified that he did not understand the TIG interim purchase

12  agreement and never agreed to its terms. This testimony has been rejected by the court; it is not

13  credible.

14      On September 17, 2001 Thomas wired $20,000 to Ribeiro's bank account in Miami

15  Florida [Ex 10]. The money was paid against Ribeiro's costs for collecting cut and polished

16  emeralds under the DRI financing scheme that the parties had agreed to, as well as the financing

17  obligations that Thomas had agreed to in the TIG interim purchase agreement. There is nothing

18  in writing which describes or confirms the purpose of this wire transfer. Thomas did not send

19  Ribeiro or Saraiva any kind of letter, email or fax, and he left the "purpose" line of the wire

20  transfer form blank. Thomas testified that he paid the money for a 23 kilogram raw emerald that

21  he purchased sight-unseen from Ribeiro and Saraiva, and not for their DRI-related costs. The

22  court has rejected this testimony; it is not credible.

23  **First Trip to Brazil in Late September 2001**

24      Catlett, Thomas and others related to DRI agreed to travel to Brazil to meet with Ribeiro

25  and Saraiva about the cut and polished emeralds that were being collected for the DRI financing

26  scheme. On September 17, 2001 visa papers were submitted for Thomas, Conetto and Catlett,

27  describing the purpose of their trip to Brazil as "mining opportunities for emeralds and other

28  precious gems" and meetings with Renata Joias [Ex 6-8 & 11]. Thomas testified that the purpose

1   of his trip was to pick up emeralds that he had purchased and not to pursue the DRI emerald

2   financing arrangements. The court has rejected this testimony; it is not credible. Thomas alleged

3   in his complaint that he traveled to Brazil in conjunction with the DRI emerald financing

4   arrangements [FAC filed 3/9/2010 at ¶9]; this is a judicial admission which conclusively

5   establishes that fact and flatly contradicts Thomas' testimony.

6          Thomas and Conetto traveled to Brazil together. They stayed in Sao Paulo at the Hotel

7   Della Volpe from September 25 through October 5, 2001 [Ex 19-20 & 21-23]. Thomas paid all

8   of Conetto's expenses for the trip. Thomas also paid the expenses for Ribeiro and Saraiva [Ex

9   23]. This is consistent with Thomas' agreement to pay Ribeiro's expenses for collecting cut and

10  polished emeralds for the DRI financing scheme until DRI could arrange funding.

11         Catlett traveled to Sao Paulo with Joy Mackell, who worked as a consultant for DRI.

12  Mackell described herself as the "transaction coordinator" of the DRI emerald investment

13  scheme, responsible for documenting the chain of title for all emeralds, arranging secure storage

14  for the emeralds, and completing all steps of the application process for the high yield investment

15  program. In return for this, Mackell was to receive 1 percent of the high yield investment

16  proceeds (about $1 million).

17         When everyone gathered in Sao Paulo, they learned that Ribeiro and Saraiva had largely

18  performed their obligations under the DRI emerald financing agreements. They had assembled

19  more than 25,000 cut and polished emeralds, from the mines of Renata Joias and other mining

20  companies in Brazil. They paid a substantial amount for the emeralds to be cut and polished and

21  fully appraised. The appraisals were conducted by Dimitri Paraskevopulos, a certified gem

22  appraiser who had worked with Ribeiro, Saraiva and Conetto for many years [Ex 1].

23  Paraskevopulos appraised the cut and polished emeralds at a total value of $25,112,000 [Ex 25].

24         Although Ribeiro and Saraiva had upheld their end of the bargain, Catlett, Thomas and

25  the others from DRI had not. That is because no one from DRI had found a source of funding.

26  The main participants – Catlett, Thomas and Mackell – largely pointed fingers at each other,

27  stating that it was someone else's responsibility to find a financier and that financing was

28  difficult because the cut and polished emeralds were not entirely suitable as collateral. Someone

Decision following Trial

9

RJN236

did arrange for the attendance of a potential financier named Bruce Ransom, but he turned out to have no money. Ribeiro and Saraiva expected to see a financier, who would arrange for a loan and make funds available for full payment of their expenses. When no funding was provided, they were disappointed. But they continued to work with Catlett and Thomas because of their promises that DRI would continue to search for financing and would ultimately pay their full expenses.

Sometime during the trip to Brazil, Ribeiro and Saraiva took Conetto and Thomas to see the Bahia Emerald. It had recently been transported to Sao Paulo, and it was being stored in the carport of a Renata Joias employee. Ribeiro and Saraiva were very proud of the emerald, and they wanted to show it to their business associates. The trip to the carport was short and uneventful; there were no business transactions discussed or agreed upon.

Thomas testified that Ribeiro and Saraiva offered to sell him the Bahia Emerald (which Thomas called the "600 pound emerald") during the trip to the carport. Thomas said he thought about the offer and agreed to purchase the emerald later in the trip. The court has rejected this testimony; it is not credible.

**The 23 kg Emerald**

Sometime during the first trip to Brazil, Ribeiro and Saraiva showed Thomas and Conetto a large raw emerald stone weighing 23 kilograms. (During trial it was referred to as the "23 kilogram emerald" or by Thomas as the "Thomas emerald." In this decision it will be called the "23 kg Emerald.")[*] Like the Bahia Emerald, the 23 kg Emerald is a solid black schist. It has a large green emerald crystal with great value, and 25 white beryl crystals which are unusual and attractive but have no commercial value. There was no evidence of the overall measurements of the 23 kg Emerald, but witnesses described it as somewhat larger than a football. It was discovered and mined by employees of Renata Joias, but there was no evidence of when or where it was mined.

---

[*] Ownership of the 23 kg Emerald is not an issue in this proceeding. But because it is so intertwined with Thomas' story about the Bahia Emerald, the court will discuss the 23 kg Emerald as well.

Rebeiro had the 23kg Emerald appraised by Dimitri Paraskevopulos, who produced an appraisal report (#1170/01) dated September 20, 2001 [Ex 13]. Paraskevopulos described the 23 kg Emerald as a unique stone, with a value that is difficult to determine. Based upon the size of the green emerald crystal and its approximate value if converted to cut and polished emeralds, he appraised the 23 kg Emerald at approximately $400,000.

Ribeiro and Saraiva brought the 23 kg Emerald to the Hotel Della Volpe and showed it to Thomas, Conetto, Catlett and Mackell. They took pictures of the emerald [Ex 26 & 30]. Ribeiro offered Thomas and Conetto the opportunity to take the 23 kg Emerald to the United States and to sell it on behalf of Ribeiro and Renata Joias in return for a commission.

Thomas and Conetto agreed to Rebeiro's proposal, and the 23 kg Emerald was delivered to them just before their return to the United States. Rebeiro and Saraiva gave them Paraskevopulos' written appraisal of the 23 kg Emerald [Ex 13] to assist in selling it and establishing a price. They also gave them a number of cut and polished emeralds to sell in the United States on the same terms. Thomas and Conetto flew back to California on October 6, 2001, and they carried the 23 kg Emerald and the cut and polished emeralds in a travel bag.

Thomas testified that he received the 23 kg Emerald and transported it to California because he purchased it from Ribeiro and Saraiva for $20,000. He testified that they had agreed upon the sale before the trip to Brazil, and Thomas bought it sight-unseen and paid them for the emerald in his September 17, 2001 wire transfer to Ribeiro's bank account [Ex10]. Thomas testified that because of this purchase he is the owner of the 23 kg Emerald. The court has rejected this testimony; it is not credible.

**Return to California**

After Catlett, Thomas, Mackell and Conetto returned from Brazil, they continued efforts to put together a loan to DRI that would use the cut and polished emeralds as collateral. No one had any clear idea where they could find a financier, and Mackell testified that the cut and polished emeralds were problematical because they were too small and numerous to sell or use as collateral. Nevertheless, she and the others continued to discuss the cut and polished emeralds with Saraiva and to search for a willing lender.

RJN238

1    Thomas and Conetto arranged to store the 23 kg Emerald at Pronto Check Cashing, a

2    business in San Jose owned by Loren "Bud" Spadafore. Thomas and Spadafore have been

3    friends for more than 20 years. Spadafore kept large amounts of cash at Pronto and therefore had

4    several large safes. The 23 kg Emerald was stored in one of them, along with the appraisal for

5    the emerald. A month or so after receiving the 23 kg Emerald for storage, Spadafore issued a

6    letter which confirmed that he was storing the emerald for Thomas [Ex 69]. The letter does not

7    say that Thomas is the owner of the 23 kg Emerald, but merely states that Spadafore was holding

8    the emerald on behalf of Thomas.

9    On October 17, 2001 Thomas wired $60,000 to Ribeiro's bank account in Miami Florida

10    [Ex 43]. The money was paid against Ribeiro's costs for collecting cut and polished emeralds

11    under the DRI financing scheme that the parties had agreed to, as well as the financing

12    obligations that Thomas had agreed to in the TIG interim purchase agreement. There is nothing

13    in writing which describes or confirms the purpose of this wire transfer. Thomas did not send

14    Ribeiro or Saraiva any kind of letter, email or fax, and he left the "purpose" line of the wire

15    transfer form blank. Thomas testified that he paid the money for the Bahia Emerald, which

16    Ribeiro and Saraiva had agreed to sell him during his first trip to Brazil, and not for their DRI-

17    related costs. The court has rejected this testimony; it is not credible.

18    Thomas testified that Ribeiro and Saraiva set the price of the Bahia Emerald at $60,000

19    because it was about three times as great as the 23 kg Emerald that they had sold to him for

20    $20,000. This testimony is utter nonsense. The Bahia Emerald is not three times as great as

21    anything related to the 23 kg Emerald. Three times the weight of the 23 kg Emerald would be 69

22    kilograms, but the Bahia Emerald weighs 341 kilograms – more than 14 times greater than the

23    smaller emerald. The 23 kg Emerald was appraised at a value of $400,000 on September 20,

24    2001 [Ex 13], and three times that value would be $1.2 million – more than 20 times greater than

25    the price claimed by Thomas. And the 23 kg Emerald is about the size of a football, while the

26    Bahia Emerald is the size of an end-table or small chair – many times greater than the smaller

27    emerald.

28

Thomas' claimed price of $60,000 also defies logic. Ribeiro and Saraiva are experienced emerald miners who have spent most of their lives mining, buying and selling emeralds, diamonds and similar stones. They both realized that Bahia Emerald was a very rare and valuable stone. They knew that the 23 kg Emerald had an appraised value of $400,000, and the Bahia Emerald was much larger and more valuable than it was. There is no reason why they would have sold the Bahia Emerald to Thomas for a fraction of its value – particularly at a time when Thomas and Catlett had failed to pay them for the substantial costs they had incurred in gathering cut and polished emeralds for the DRI financing scheme.

In mid-October 2001, Thomas took the 23kg Emerald and some cut and polished emeralds to DRI. The emeralds were displayed to DRI employees in a conference room. Catlett told the employees that Thomas had brought the emeralds back from Brazil, and they would help DRI generate capital. This elaborate show by Thomas and Catlett was deceptive and misleading. Nevertheless, the DRI employees (who had not been paid salaries for many months) became hopeful that the emeralds could help DRI stay afloat.

In mid-October 2001, Catlett, Thomas, Conetto and Mackell made arrangements to return to Brazil to meet with Ribeiro and Saraiva about the DRI financing scheme. Thomas testified that by this time the emerald financing deal was completely dead. The court has rejected this testimony; it is not credible.

In mid-October 2001, Saraiva told Mackell in a telephone call that he and Ribeiro had a new idea that might help the DRI financing scheme move forward: they had a "new and substantial" emerald that might be used as collateral for the DRI loan. Mackell testified that she was intrigued by this proposal and became optimistic that DRI's financing might be pulled together after all. While Saraiva was not specific, Mackell believed in retrospect that he was referring to the Bahia Emerald and that DRI might be able to use this "new and substantial" emerald as a source of funding.

Sometime in October 2001, Catlett gave Thomas a revised agreement concerning the TIG and DRI financing arrangements [Ex 32 p. 50-58]. Like the original TIG interim purchase agreement [Ex 356] the revised agreement was between TIG and the "Brazilian Group"

1  (consisting of Thomas and Conetto), and it contained many detailed provisions about the emerald

2  financing scheme.  The parties never executed the revised agreement.

3    In mid-October 2001 Thomas exchanged emails with Mark Holden, who lives in

4  Vancouver, has known Thomas since 1999, and considers Thomas a friend. Thomas sent Holden

5  emails that attached appraisals of the 23 kg Emerald and the cut and polished emeralds that had

6  been collected by Ribeiro and Saraiva [Ex 36-41]. Holden testified that Thomas asked him to

7  research the value of comparable emerald stones, although Holden admitted that he has no

8  particular experience with gemstones or appraisals. Holden in turn had communications with

9  Robert DeZanger, a former business associate in Florida, regarding possible use of the emeralds

10  as loan collateral. The evidence regarding Thomas' interaction with Holden is confusing and

11  incomplete. Although Holden identified the emails, it is not clear how they were printed, what

12  their origin is, or whether the exhibits truly reflect the email communications that occurred in

13  October 2001.

14  **Second Trip to Brazil in October 2001**

15    Conetto flew to Sao Paulo ahead of Thomas on October 18, 2001, and Thomas joined

16  him on October 23, 2001 [Ex 44, 47-48 & 53]. They again stayed at the Hotel Della Volpe, with

17  Thomas paying all expenses for Conetto and Ribeiro [Ex 45 & 49-51].  Like the first trip,

18  Thomas' payment of Ribeiro's hotel expenses is consistent with his agreement to advance the

19  costs of collecting cut and polished emeralds for the DRI financing scheme.

20    The same day that Thomas departed for Brazil, October 23, 2001, he wired $20,000 to

21  Ribeiro's bank account in Miami Florida [Ex 46].  The money was paid against Ribeiro's costs

22  for collecting cut and polished emeralds under the DRI financing scheme that the parties had

23  agreed to, as well as the financing obligations that Thomas had agreed to in the TIG interim

24  purchase agreement. There is nothing in writing which describes or confirms the purpose of this

25  wire transfer. Thomas did not send Ribeiro or Saraiva any kind of letter, email or fax, and he left

26  the "purpose" line of the wire transfer form blank. Thomas testified that he paid the money for

27  emeralds that Ribeiro and Saraiva sold him during his first trip to Brazil, and not for their DRI-

28  related costs. The court has rejected this testimony; it is not credible.

1  The second trip to Brazil was unproductive. Like the first trip, Ribeiro and Saraiva were
2  ready to perform. They still had more than $25 million in cut and polished emeralds that were
3  available for use as collateral. But Catlett, Thomas and the others from DRI had not arranged for
4  any source of financing to complete the transaction. As a result, much of the time in Sao Paulo
5  was spent with pleasantries rather than business.
6      On October 25, 2001 Thomas and Connetto visited Farmaervas, a Brazilian cosmetics
7  company located in the Sao Paulo area. They toured the Farmaervas facility and had some
8  discussions about investment opportunities.
9      On the same day, October 25, 2001, Ribeiro paid a tax for the Bahia Emerald at the Bahia
10 State Government Treasury Department. He received a Brazilian DAE tax form in the name of
11 Antonilton Oliveira Vieira, the employee of Renata Joias who was storing the emerald [Ex 186].
12 The tax was required for moving the emerald from one state in Brazil (Bahia) to another state
13 within Brazil (Sao Paulo).
14     Thomas testified that he is the one who paid the DAE tax. He said that he paid the tax in
15 cash, but he had no receipt or other evidence of payment. Thomas said that the fee covered an
16 export tax that was required to ship the Bahia Emerald from Brazil to the United States. This
17 testimony has been rejected by the court; it is not credible. The tax form contains no reference to
18 Thomas at all. It was produced by Saraiva at his deposition, and Thomas never produced the
19 form or mentioned payment of an export tax in his pre-trial discovery responses. The most
20 persuasive translation of the tax form [Ex 449] supports Saraiva's testimony that it relates to an
21 internal transfer tax rather than an export fee, and so do the Brazilian laws for which the court
22 has taken judicial notice at trial.
23     On October 26, 2001, while touring around Sao Paulo, Ribeiro and Saraiva took Conetto
24 and Thomas back to the carport to see the Bahia Emerald. They stayed for an hour or so, with
25 Conetto and Thomas taking a number of pictures of the emerald [Ex 31, pp. 4-9]. No one
26 discussed business at the carport, and no one discussed the purchase, transfer or shipping of the
27 Bahia Emerald.
28

Decision following Trial

15
RJN242

1    Thomas gave elaborate testimony about his activities at the carport on October 26, 2001.

2  He testified that he was at the carport nearly all day; he had purchased the emerald from Ribeiro

3  and they all made plans for him to transport the emerald to California; he cleaned and oiled the

4  emerald; he made calls to airlines for arrangements to ship the emerald; he made plans to build a

5  shipping crate for the emerald; and at his request Dimitri Paraskevopulos came to the carport and

6  appraised the emerald. Thomas even drew diagrams of how he moved the emerald around the

7  carport nine years earlier [Ex 193]. The court has rejected this testimony; it is not credible.

8    On the evening of October 26, 2001 Thomas, Conetto, Ribeiro and Saraiva attended the

9  "happy hour" in the lobby of the Hotel Della Volpe. A representative of Farmaervas also joined

10  them, as did Catlett and Mackell. The members of the group socialized with one another, but no

11  one discussed any transactions concerning the Bahia Emerald.

12    Thomas testified that sometime during the gathering at the Hotel Della Volpe, Ribeiro

13  and Saraiva took him aside and presented him with a bill of sale for the Bahia Emerald, 23 kg

14  Emerald and other stones. He testified that Catlett, Mackell and Conetto witnessed the

15  transaction. Thomas testified that he made one copy of the bill of sale, which he gave to Ribeiro,

16  but he made no other copies for himself or anyone else. He testified that the bill of sale has been

17  lost, but it resembled the bill of sale that Ribeiro and Saraiva gave to Martin Garcia in northern

18  California [Ex 2]. Thomas gave elaborate testimony about the contents of the bill of sale and

19  how it was presented to him at the hotel. Mackell gave similar testimony, largely supporting

20  Thomas' version of the event. The court has rejected this testimony by Thomas and Mackell; it

21  is not credible.

22    Thomas and Conetto departed Sao Paulo for California during the evening of October 26,

23  2001 [Ex 44-45 & 47-48]. Thomas has given wildly inconsistent testimony on this subject. In his

24  pre-trial deposition Thomas testified that he remained in Brazil through November 11, 2001 to

25  arrange for shipment of the Bahia Emerald; he gave a detailed description of how he decided to

26  use Federal Express for shipment and then left it to Ribeiro and Saraiva to make the final

27  shipping arrangements. In the first trial, Thomas testified that he left Brazil on October 26, 2001

28  because of an emergency: his son broke his arm and he needed to return home immediately to

1  help with his son. In fact, medical records show that Thomas' son broke his arm on October 1,

2  2001 and he received medical treatment at that time [Ex 194]. It appears that Thomas returned

3  home during the second trip on October 26, 2001 either because he planned to do so all along, or

4  because his son's arm was not mending properly and his wife needed help in caring for him.

5       Thomas introduced copies of his cellular telephone bills, which list numbers that were

6  called during his trips to Brazil [Ex 42 & 91]. These records establish the numbers that were

7  called, but they say nothing about the content or subjects of the calls. Thomas testified about the

8  calls and gave elaborate descriptions of the subjects that were discussed. The court has rejected

9  this testimony; it is not credible.

10  **Arrangements in Brazil**

11       Although Thomas returned to California on October 26, 2001, Mackell remained there

12  through November 10, 2001 [Ex 27]. On behalf of DRI, she made arrangements to store and

13  secure the emeralds that Ribeiro and Saraiva had gathered, including the Bahia Emerald. One

14  day Ribeiro and Saraiva took her on a sight-seeing tour, and they showed her the Bahia Emerald

15  in the carport.  Mackell had her photo taken with the emerald [Ex 28].

16       On October 29, 2001 safety deposit box #190-G was leased at Banco do Brasil in Sao

17  Paulo, for storage of the cut and polished emeralds that Ribeiro and Saraiva had collected for

18  DRI [Ex 213 & 214]. The lease was signed by Ribeiro, Saraiva and Catlett. The Bahia Emerald

19  was also stored in a vault at the Banco do Brasil for a short time, but there were complications

20  which required the emerald to be returned to the same carport storage area.

21       Mackell returned to California on November 10, 2001, and she continued to work on

22  arrangements for the Bahia Emerald on behalf of DRI. She received an appraisal for the emerald

23  from Ribeiro and Saraiva, and she ultimately intended to bring the Bahia Emerald to California

24  for use as collateral by DRI in the high-yield investment program.

25  **November 2001**

26       In November 2001, there were a number of fax communications among Thomas, Holden

27  and Saraiva concerning appraisals of the 23 kg Emerald and the Bahia Emerald [Ex 60-61, 63-

28  68, 70-74, 76, 79, 80-81 & 84].  As in the case of the earlier communications between Thomas

1   and Holden, these faxes are confusing and incomplete; it is not clear how they were printed, what

2   their origin is, or whether the exhibits truly reflect the communications that occurred.

3       The exhibits and corresponding testimony indicate that Holden and Thomas had

4   developed information about the value of a raw emerald stone at the British Museum in London,

5   and this information was shared with Saraiva and Dimitri Paraskevopulos. Parakevopulos then

6   prepared a revised appraisal of the 23 kg Emerald and an appraisal of the Bahia Emerald, which

7   were transmitted to Thomas. Parakevopulos testified that he prepared the appraisals at the

8   direction of Ribeiro and Saraiva, and he regarded Ribeiro as the owner of both emeralds,

9   although others were giving him information about their value.

10      The revised appraisal of the 23kg Emerald (#1170/01) was dated November 5, 2001 and

11  certified on November 14, 2001 [Ex 56]. The technical data is largely the same as the earlier

12  September 20, 2001 appraisal [Ex 13], but it compares the 23kg Emerald to a raw emerald in the

13  British Museum, having a reported value of $792 million. The revised appraisal changed the

14  value of the 23kg Emerald to $800 million.

15      The Bahia Emerald appraisal (#1206-01) was dated November 5, 2001 and certified on

16  November 16, 2001 [Ex 57]. Parakevopulos physically inspected the emerald on November 5,

17  2001 at the Banco do Brasil during its temporary stay at the bank, which was the first time that

18  he saw it. The appraisal describes the emerald as a "block of black schist with enormous green

19  crystals I have classified as emeralds." It also refers to the emerald stone in the British Musuem,

20  and it states that the value of the Bahia Emerald is $925 million.

21      On November 15, 2001 the appraisals were faxed to Thomas from the Hotel Della Volpe

22  [Ex 189]. Saraiva testified that the appraisals were provided for the DRI loan program and to

23  assist Thomas in finding buyers or lenders for the emeralds in the United States. These

24  communications are not consistent with Thomas' testimony that Ribeiro and Saraiva had sold

25  him the 23 kg Emerald and Bahia Emerald. If the emeralds had in fact been sold to Thomas,

26  Ribeiro and Saraiva would have had no reason to be involved in obtaining appraisals at that time.

27      At about the same time as these appraisal communications, Thomas took steps to engage

28  a "trading credit facility" on behalf of T&D Construction, which involved the right to

Decision following Trial

18
RJN245

1    "hypothecate" the 23 kg Emerald [Ex 78, 85 & 87]. Thomas did not tell Ribeiro or Saraiva that

2    he was using the emerald for this purpose, and they did not authorize his conduct. In connection

3    with this transaction, Thomas executed a notarized document in which he stated under oath that

4    "I own the assets (emeralds) they originate from the mine I own." [Ex 62]. This statement was

5    false: Thomas did not own the emeralds, and they did not come from a mine that he owned.

6        On November 16, 2001, a few days before Ribeiro and Saraiva departed from Brazil for a

7    trip to the United States, Thomas wired $60,000 to Ribeiro's bank account in Miami Florida [Ex

8    83]. The money was paid against Ribeiro's costs for collecting cut and polished emeralds under

9    the DRI financing scheme that the parties had agreed to, as well as the financing obligations that

10   Thomas had agreed to in the TIG interim purchase agreement. There is nothing in writing which

11   describes or confirms the purpose of this wire transfer. Thomas did not send Ribeiro or Saraiva

12   any kind of letter, email or fax, and he left the "purpose" line of the wire transfer form blank.

13   Thomas testified that he paid the money for the purchase of cut and polished emeralds, and not

14   for DRI-related costs. The court has rejected this testimony; it is not credible.

15       Ribeiro and Saraiva traveled to the United States and arrived in California about

16   November 18, 2001. During their visit, Ribeiro and Saraiva spent time with Thomas and

17   Conetto, who introduced them to people who might be interested in buying emeralds. They also

18   went to Thomas' home and business office at T&D Construction. Thomas and others have

19   testified that during these meetings and visits, Ribeiro and Saraiva admitted that Thomas had

20   purchased the 23 kg Emerald and the Bahia Emerald. The court has rejected this testimony; there

21   is no credible or persuasive evidence to support any admission or adoptive admission by Ribeiro

22   or Saraiva.

23       On November 22, 2001 Ribeiro and Saraiva attended Thanksgiving dinner with Thomas

24   and his family. There was a large group of about 32 people at the dinner, many of whom were

25   young children. Everyone gathered in one large and very noisy room, where there was talking,

26   playing and television noise. Thomas and others have testified that during the Thanksgiving

27   dinner, Ribeiro and Saraiva admitted that Thomas had purchased the 23 kg Emerald and the

28

1 Bahia Emerald. The court has rejected this testimony; there is no credible or persuasive evidence
2 to support any admission or adoptive admission by Ribeiro or Saraiva.

3       Thomas testified that during their visit to northern California he paid Ribeiro and Saraiva
4 $100,000 in cash on one occasion and another $26,000 in cash on another occasion, all for the
5 purchase of emeralds. There is nothing in writing which describes or confirms these cash
6 payments. There is no receipt of any kind, and Thomas did not send Ribeiro or Saraiva any kind
7 of letter, email or fax confirming any cash payments.

8       Ribeiro and Saraiva remained in northern California until approximately December 3,
9 2001, when they left for Florida. At the time they departed, Ribeiro and Saraiva were becoming
10 very unhappy. They had performed their end of the DRI transaction, by collecting cut and
11 polished emeralds and making them available to DRI. They had incurred enormous expenses and
12 had been reimbursed only a small portion of their costs by Thomas. Thomas, Catlett and the
13 others at DRI had promised more than $3 million in loan payments by DRI, but no one had
14 arranged any kind of financing. They pressed Catlett and Thomas for more money to cover their
15 expenses and keep the DRI transaction alive.

16       On November 27, 2001 Thomas wired $74,000 to Ribeiro's bank account in Miami
17 Florida [Ex 86]. The money was paid against Ribeiro's costs for collecting cut and polished
18 emeralds under the DRI financing scheme that the parties had agreed to, as well as the financing
19 obligations that Thomas had agreed to in the TIG interim purchase agreement. There is nothing
20 in writing which describes or confirms the purpose of this wire transfer. Thomas did not send
21 Ribeiro or Saraiva any kind of letter, email or fax, and he left the "purpose" line of the wire
22 transfer form blank. Thomas testified that he paid the money for the purchase of cut and polished
23 emeralds, and not for DRI-related costs. The court has rejected this testimony; it is not credible.

24       On December 11, 2001 Mackell sent a friendly email to Ribeiro [Ex 77]. Mackell
25 followed up on some of the matters they had discussed about the DRI transaction, and she stated
26 that she was continuing to work on some "options" for the DRI transaction.  This communication
27 indicates that the parties were continuing to work on the DRI financing scheme at that time.

28

Decision following Trial

20
RJN247

### Early Months of 2002

Thomas' $74,000 wire transfer on November 27, 2001 was his last payment to Ribeiro for costs associated with the DRI financing scheme. By early 2002, Ribeiro and Saraiva were frustrated with the failure of Thomas and Catlett to cover their expenses incurred in gathering cut and polished emeralds for DRI. They continued to press Thomas and Catlett for payment, but received nothing. On January 17, 2002 Saraiva sent a fax letter to Thomas through Conetto which asked for additional money [Ex 306]. Thomas was aware of Saraiva's request, but he never responded to it. Thomas testified that he did not see this fax and was not aware in January 2002 that Saraiva requested additional money from him for the expenses that he and Ribeiro had incurred. This testimony has been rejected by the court; it is not credible.

Sometime in January or February 2002, Conetto traveled to Sao Paulo with Marco Diaz-Infante. The evidence is not clear as to when the trip occurred; testimony was conflicting and there were no tickets or other documents which clearly established the date. On January 30, 2002 Thomas sent a letter to the Brazilian consulate, requesting visa arrangements for Conetto [Ex 97]; this suggests that Conetto's trip to Brazil was sometime after that date.

Marco Diaz-Infante lives in northern California and has been a close friend of Conetto for many years. He was also a close friend of Thomas for many years; Thomas is in fact the godfather of one of Diaz-Infante's children. At the time of trial, Thomas and Diaz-Infante were no longer friends.

Conetto and Diaz-Infante went to Brazil to make amends with Ribeiro and Saraiva, who were very unhappy with their failure to receive payment from Thomas, Catlett and the others at DRI. Conetto had been close to the Brazilians for years and had introduced them to the DRI transaction. So he met with Ribeiro and Saraiva to mend fences and try to keep them involved in the lagging DRI transaction. Saraiva testified that Conetto and Diaz-Infante apologized profusely during the trip, and urged them to continue with the DRI transaction. Ribeiro and Saraiva agreed to give everyone more time.

Thomas gave completely different testimony about the trip to Brazil by Conetto and Diaz-Infante. Thomas testified that he sent them to Brazil to search for the Bahia Emerald, which

1   was supposed to have been shipped to him via Federal Express by Ribeiro and Saraiva after his

2   last trip to Sao Paulo in October 2001. Thomas testified that Conetto and Diaz-Infante told him

3   that:  the Bahia Emerald had been stolen; Ribeiro and Saraiva had arranged to ship the emerald

4   through Federal Express; the emerald disappeared in transit; it appeared to be an "inside job" at

5   Federal Express; and the Brazilian government and police were so corrupt that it was not worth

6   pursuing the theft with the Brazilian authorities. The court has rejected this testimony; it is not

7   credible.

8         Thomas testified that in early 2002 Saraiva told him similar information: the Bahia

9   Emerald had been shipped to California by Federal Express, but it had disappeared in transit. The

10  court has rejected this testimony; it is not credible.

11        There is nothing in writing which memorializes or confirms any of Thomas' testimony

12  about the loss or theft of the Bahia Emerald. Thomas did not send Ribeiro or Saraiva any kind of

13  letter, email or fax about shipping the Bahia Emerald to him. Thomas said he did not receive (or

14  ask for) any kind of shipping documents or transit numbers from Federal Express. Thomas also

15  did not send Reibeiro or Saraiva any kind of letter, email or fax about the loss of the Bahia

16  Emerald in transit. Thomas did not file a claim or make any kind of written or telephonic inquiry

17  with Federal Express or any other shipping company. Thomas did not file a claim or make any

18  kind of written or telephonic inquiry with the Brazilian government or any other agency in

19  Brazil. Thomas did not file a claim or make any kind of written or telephonic inquiry with the

20  United States government or any other agency in this country.

21        During the early months of 2002, Thomas ended all communications with Saraiva and

22  Ribeiro and he terminated his participation with DRI. Saraiva testified that Thomas abandoned

23  the DRI project around this time. Catlett testified that Thomas told him that he had lost too much

24  money on DRI and that he was not participating any longer.

25        Sometime in January or February 2002, Thomas had a meeting with a representative of

26  the Santa Clara County District Attorney's Office. The evidence is not clear as to when the

27  meeting occurred; testimony was conflicting and there was no documentation or reliable

28  evidence of its date.  Thomas attended the meeting with his attorney Frank Ubhaus, Conetto,

Decision following Trial

22
RJN249

1  Shawn Brassfield, and Patrick Daugherty. Brassfield and Daugherty have been friends of

2  Thomas for many years, and they each invested heavily in DRI (over $1 million for Brassfield,

3  and over $300,000 for Daugherty).

4       Virtually all of the meeting at the District Attorney's office was devoted to Thomas'

5  complaints about Catlett and DRI. The District Attorney's office never took action on any of

6  Thomas' complaints. Near the end of the meeting Thomas said that he had purchased a large

7  emerald in Brazil and it was missing. The evidence is conflicting and unclear as to precisely

8  what Thomas said and what documents he had with him during the meeting. Thomas and

9  Daugherty testified that Thomas had the Bahia Emerald bill of sale with him during the meeting.

10  The court has rejected this testimony; it is not credible.

11       Although Thomas had ended his participation in the DRI financing activities, Catlett and

12  Mackell continued to communicate with Ribeiro and Saraiva. Catlett urged them to continue to

13  work with him on the DRI financing scheme, so that they could recover their expenses and make

14  a profit from DRI's success. Catlett said that he could not find any lenders who would accept the

15  cut and polished emeralds as collateral, so he urged them to use the Bahia Emerald as potential

16  collateral for DRI financing. Ribeiro and Saraiva agreed to do so, and they began to explore this

17  approach.

18  **Remainder of 2002**

19       Sometime in the first quarter of 2002, Ribeiro and Saraiva arranged for the Bahia

20  Emerald to be returned to a storage vault at the Banco do Brasil in Sao Paulo. The evidence

21  includes a lease dated October 24, 2002 by Ribeiro [Ex 215]. Both Ribeiro and Saraiva testified

22  that the emerald was placed into storage before that document, during the early months of 2002.

23       On April 22, 2002, Dimitri Paraskevopulos prepared a revised appraisal of the Bahia

24  Emerald (#192/02) which declared its value as $372 million [Ex 99]. Paraskevopulos prepared

25  this appraisal at the request of Ribeiro for use in the DRI financing scheme.

26       Paraskevopulos was not paid for his appraisals of the Bahia Emerald, the 23 kg Emerald,

27  and the cut and polished emeralds. Like Ribeiro and Saraiva, he was very unhappy about this.

28

1  On June 28, 2002 Catlett sent a letter to Ribeiro which promised to pay the bills for the

2  appraisals prepared by Paraskevopulos [Ex 101]. Catlett never paid any of the bills.

3      In October 2002 Ribeiro and Catlett entered into an agreement which acknowledged that

4  the Bahia Emerald was owned by Ribeiro, and which granted Catlett a power of attorney to

5  include the Bahia Emerald in a "high-yield investment program" [Ex 105 & 106]. Ribeiro later

6  revoked this power of attorney on April 28, 2008 due to Catlett's failure to perform his financial

7  and written agreements [Ex 216]. But between October 2002 and April 2008, Ribeiro cooperated

8  with Catlett in using Bahia Emerald as potential collateral for the high yield investment program.

9      In October 2002 Catlett applied to the International Chamber of Commerce for

10 participation in its "secured high yield investment program." His application pledged assets with

11 a value of $372 million, using the Bahia Emerald as collateral [Ex 190]. The application papers

12 include an "affidavit of ownership" for the emerald, and an "affidavit of safe keeping" which

13 states that the Bahia Emerald was stored in a secured bank vault in Sao Paulo. Mackell assisted

14 Catlett in completing these ICC application forms. Catlett was never accepted into the ICC

15 program, and no money was ever disbursed to Catlett or DRI.

16 **Events after 2002**

17      The evidence concerning many of the events after 2002 is somewhat incomplete and

18 sketchy, but it indicates the following.

19      On May 21, 2004 Dimitri Paraskevopulos prepared an appraisal of the Bahia Emerald

20 (#110-04) [Ex 111]. The appraisal expressly recites that Ribeiro is the owner of the emerald and

21 it states that the appraised value is $372 million.

22      On August 31, 2004 Ribeiro executed an "assignment and bill of sale" for the Bahia

23 Emerald [Ex 114 & 303]. This transferred title of the emerald to Gemworks Mining Inc., a

24 Panama corporation whose shareholders were Ribeiro, Saraiva, Catlett and Conetto.  Ribeiro

25 testified that this was later canceled or rescinded.

26      In August 2006 Thomas' house in northern California was burned to the ground in a fire,

27 destroying the structure and virtually all contents. At the time of the fire, Thomas had a safe

1    deposit vault at a bank in Reno, Nevada. Thomas stored the 23kg Emerald and the appraisal for
2    that emerald in his bank vault.
3         Thomas testified that at the time of the fire, the bill of sale which listed the Bahia
4    Emerald and the 23 kg Emerald was stored in a file cabinet located in the garage of his home.
5    Thomas has given conflicting testimony as to what happened to the bill of sale: he has testified
6    that it burned during his house fire; and he has testified that it and the file cabinet were taken and
7    retained by a fire cleanup company hired by Farmers Insurance Co. The court has rejected this
8    testimony; it is not credible.
9         In February 2005 the Bahia Emerald was shipped to the United States via Federal
10   Express.  Shipping costs were paid by Ribeiro. The emerald has remained in the United States
11   through the present.  It was stored at various times in northern California, New Orleans, southern
12   California, and Las Vegas. It is currently in the custody of the Los Angeles County Sheriff's
13   Department.

**LEGAL ISSUES**

14
15        Thomas claims that he is the owner of the Bahia Emerald because he and Ribeiro entered
16   into a contract for the sale of the emerald, which transferred title to him.
17        The general requirements for proof of a contract are well settled. In order to establish a
18   contract, Thomas must prove that 1) the contract terms were clear enough that the parties could
19   understand what each was required to do; 2) the parties agreed to give each other something of
20   value; and 3) the parties agreed to the terms of the contract. CACI 302; Civ. Code §1550. An
21   objective standard is applied to determine if there was mutual consent between the parties. E.g.
22   Hilleary v. Garvin (1987) 193 Cal.App.3d 322, 327 ("The test is whether a reasonable person
23   would, from the conduct of the parties, conclude that there was mutual agreement."). The
24   surrounding circumstances and conduct of the parties are important in determining whether there
25   was mutual consent. E.g. Fowler v. Security-First Natl. Bank (1956) 146 Cal.App.2d 37, 47 ("If
26   words are spoken under circumstances where it is obvious that neither party would be entitled to
27   believe that the other intended a contract to result, there is no contract.").
28

Decision following Trial

1    The parties have agreed that the California Uniform Commercial Code governs this case.

2    The Code liberalizes the general rules of contract formation to some extent, because there is no

3    requirement of proof that the parties mutually agreed upon each and every essential term. Steiner

4    v. Mobil Oil Corp. (1977) 20 Cal.3d 90, 104-08. But the Code clearly requires agreement

5    between the parties, which recognizes the existence of a contract. See Comm. Code §2204(1).

6    And "the court must find some basis for concluding that the parties engaged in a process of offer

7    and acceptance, rather than inconclusive negotiations." Steiner, supra 20 Cal.3d at 104; accord

8    Hebberd-Kulow Enterprises v. Kelomar (2013) 218 Cal.App.4th 272, 282.[*]

9    Thomas has the burden of proof in this proceeding, and he must prove every necessary

10   element of his claim. E.g. Dimmick v. Dimmick (1962) 58 Cal.2d 417, 421 ("In an action to

11   quiet title ... the burden is upon the claimant to prove every necessary element."). Thomas has

12   not established any of these necessary elements, and he has not proven his claim of ownership.

13   That is because:  1) Thomas has presented no credible or persuasive evidence in support of any

14   of the elements of his claim, and 2) Thomas' claim is barred by the statute of limitations.

15   **Thomas has not sustained his burden of proof with credible, persuasive evidence**

16   While the evidence was extensive, the case really comes down to a simple dispute:

17   Thomas claims that he entered into an oral contract to purchase the Bahia Emerald from Ribeiro,

18   while Ribeiro and his associate Saraiva strongly deny Thomas' claim. The parties have

19   dramatically different versions of the facts. Because the case essentially comes down to a

20   question of whom to believe, the court gave the parties extraordinary latitude in presenting

21   evidence of credibility. The court has examined that evidence carefully and it has concluded that

22   the evidence in support of Ribeiro and Saraiva is credible and convincing, while Thomas'

23   evidence is not.

24

25

26

27

---

28   [*] The parties have presented extensive briefing on the requirements for delivery and passage of title under the
     Commercial Code. E.g. §§ 2301, 2404 & 2502. Because the court has found that Thomas did not purchase the Bahia
     Emerald, it is not necessary to discuss this issue.

Decision following Trial

1    The court has commented on credibility in the discussion of facts above. But because

2    credibility is such an important part of this decision, the court will give further explanation of the

3    factors which were considered in making credibility determinations.

4        The starting point is with the key witnesses themselves. Ribeiro and Saraiva were entirely

5    credible. The court found their testimony consistent and logical. Their manner of testimony was

6    believable and persuasive. They were never parties to this action and do not claim any interest in

7    the Bahia Emerald. Ribeiro and Saraiva denied each aspect of Thomas' claims, and their

8    testimony was convincing. As indicated in the discussion of the facts above, the court has

9    accepted their testimony in making its factual findings.

10        Thomas on the other hand was not a credible witness. The court had great opportunity to

11    view and consider him, and he made an entirely negative impression. His manner on the witness

12    stand was completely unconvincing and the court has no confidence in him at all. His story has

13    no sense or logic. And his testimony throughout the case has been conflicting and inconsistent.

14    Thomas' testimony was like sand in the wind – constantly shifting and changing its shape.

15        Thomas' most critical witness was Mackell, who testified in support of his story that

16    Ribeiro and Saraiva issued a bill of sale for the Bahia Emerald. She also was not credible. Her

17    manner on the witness stand was unconvincing and suspicious. She admitted that she met

18    repeatedly with Thomas and his former attorney in 2010. During the first trial Mackell stated that

19    she "assumed" that Thomas was the owner of the Bahia Emerald; by the time of our trial, this

20    had evolved into a clear and definite pronouncement of his ownership. In 2009 Mackell prepared

21    notes that summarized her activities in the DRI financing scheme; yet the notes do not say

22    anything about Thomas purchasing the Bahia Emerald [Ex 34]. Mackell described herself as

23    DRI's "transaction coordinator" who was responsible for documenting the chain of title for the

24    Bahia Emerald and arranging for its storage; yet she never obtained a photocopy of the critical

25    bill of sale that she claims to have seen.

26        Another reason why Thomas' story is not credible or persuasive is his implausible

27    evidence about the disappearance of the bill of sale for the Bahia Emerald. He claims that the

28    original bill of sale issued by Ribeiro and Saraiva was destroyed by the fire which leveled his

1 home, which also destroyed a computer that had a digital image of the document. While there
2 can be no question that Thomas' home was burned in a tragic fire, it is simply unbelievable that
3 Thomas would not have stored the bill of sale in a safe place – or more precisely, in many safe
4 places. Thomas had appraisals listing the value of the 23kg Emerald as $800 million and the
5 Bahia Emerald as $925 million. Yet Thomas did not preserve copies of the bill of sale which
6 provided evidence that he owned these valuable stones? At the time his house burned, Thomas
7 maintained a bank vault where he stored the 23 kg Emerald and the appraisals for that stone. But
8 Thomas did not keep a copy of the bill of sale in the vault, with the emerald that he claims to
9 have been described on it? Thomas testified that he gave a copy of the bill of sale to Ribeiro, but
10 he never asked for a duplicate record after his house and its contents were destroyed? Thomas'
11 story defies common experience and makes no sense whatsoever.

12 Thomas claims to have sent a digital image of the bill of sale to his friend Mark Holden,
13 who stored the image on his computer. Holden testified that, like Thomas, he has no evidence of
14 the bill of sale because he too suffered a tragic loss: his computer crashed. It is odd that Thomas
15 would send an image of this valuable document to only one person; odder still that this one
16 person would lose it without any backup or remote storage of his computer data. A suspicious
17 aspect of Holden's interaction with Thomas is the fact that the evidence includes many email and
18 fax transmissions between Thomas and Holden, but there are no references of any kind to the bill
19 of sale [see Ex 36-41 & 92-96]. Their transmissions include references to appraisals and
20 photographs of the emeralds, but nothing about the bill of sale that Thomas claims to have sent to
21 his friend. These gaps, as well as the fact that Holden said nothing about receiving a digital
22 image of the bill of sale during the first trial, make Thomas' story untrustworthy.

23 Other evidentiary gaps in Thomas' case are also very troublesome. It is extraordinarily
24 significant that Thomas has no documents of any kind to support or corroborate his story.
25 Thomas claims to have engaged in a multi-step transaction with Ribeiro and Saraiva for his
26 purchase of the Bahia Emerald: an agreement to sell; a wire transfer of the purchase money; an
27 agreement for Thomas to pick up the emerald in Brazil; a revised agreement for Ribeiro and
28 Saraiva to ship the emerald to Thomas in California; and a representation by Saraiva that he had

Decision following Trial

28
RJN255

arranged to ship the emerald to Thomas by Federal Express. According to Thomas, all of these steps were conducted orally, without <u>anything</u> in writing to describe, confirm or ask questions about the transaction. No letters, emails, faxes, tracking numbers, shipping records, insurance documents – nothing whatsoever! It is unbelievable that an experienced businessman like Thomas would go through a significant business transaction of this kind without generating a single document.[*]

In response to cross-examination, and some pointed questions by the court, Thomas testified that he did not have any written communications with Ribeiro and Saraiva because his dyslexia and rudimentary computer skills prevented him from sending emails, faxes and letters. This testimony is absurd. The record is filled with faxes, letters and emails in which Thomas corresponded with others on matters related to the Bahia Emerald and DRI transactions [see Ex 36-41, 84, 85, 87, 92-96 & 107 (emails); Ex 6-7, 11, 54, 97 (letters); Ex 60-61 63-68, 70-74, 76, 79, 80-81 (faxes)]. Somehow Thomas managed to send and preserve these written communications about tangential matters, but he has nothing which corroborates any aspect of the purchase transaction itself. This alone makes all of Thomas' evidence during trial very suspicious and untrustworthy.

In argument, Thomas places a heavy emphasis on evidence concerning statements made after November 2001 about the Bahia Emerald. Thomas points to his own statements to others, in which he claimed to have purchased the Bahia Emerald from Ribeiro. These statements have no evidentiary value. Without credible and persuasive evidence to support the purchase transaction itself, Thomas' statements are empty and self-serving. They do not support ownership of the Bahia Emerald. Thomas has presented an unbelievable story to the court; the fact that he has told his family and friends the same story does not make it any better.

Thomas also points to statements made by or in the presence of Ribeiro and Saraiva, arguing that they made a declaration against interest or an admission by a predecessor in title.

---

[*] Commercial Code §2201(1) requires a contract for the sale of goods over $500 to be in writing, and Thomas has not met these requirements. Because the court has found that Thomas never entered into any kind of purchase agreement for the Bahia Emerald, it is not necessary to discuss this issue or any exceptions to the statute of frauds.

Decision following Trial

1  See Evid. Code §1224 & §1230. As a technical matter this ground only pertains to Ribeiro,

2  because Saraiva never had an ownership interest in the Bahia Emerald. But in any event, there is

3  no credible or persuasive evidence of any admission by Ribeiro or Saraiva. Neither man ever

4  stated that the Bahia Emerald had been sold to Thomas. The evidence about statements made in

5  the presence of Ribeiro and Saraiva was conflicting and ambiguous. At best the evidence

6  supports nothing more than general statements of goodwill and hope for success in the emerald

7  ventures with Thomas – which is consistent with the joint DRI financing scheme and Ribeiro and

8  Saraiva's authorization for Thomas to find a buyer for the Bahia Emerald, 23 kg Emerald and

9  other stones. And there is no credible or persuasive evidence that Ribeiro or Saraiva heard or

10  understood any statements that were made in their presence, which is an express requirement for

11  an admission. See Evid. Code §1230; Hendron v. Northam (1917) 176 Cal. 493, 497; Fisch v.

12  Los Angeles MTA (1963) 219 Cal.App.2d 537, 540 (it must be clear that the declarant heard and

13  understood the statement). That is especially true for Ribeiro, the controlling owner of the Bahia

14  Emerald, who is not even fluent in English.

15        Finally, Thomas points to statements made by or in the presence of Conetto and Catlett,

16  arguing that they made an admission by a party or an admission by a predecessor in title. See

17  Evid. Code §1220, §1221 & §1230. The evidence about statements made by Conetto and Catlett

18  or statements that Thomas made in their presence was conflicting and ambiguous. Moreover,

19  Thomas' argument must be viewed in its proper context. The entire DRI financing scheme was

20  based upon bravado, false statements and empty promises. Thomas, Catlett, Mackell, Conetto

21  and the others associated with the DRI financing scheme were desperate to keep the company

22  afloat and earn enormous returns from a successful venture, and they made many empty and

23  unsupported statements to accomplish that purpose. That is what convinced Ribeiro and Saraiva

24  to collect cut and polished emeralds and suffer enormous losses; that is what convinced

25  Paraskevopulos to produce one appraisal after another without compensation; and that is what

26  convinced the DRI employees to work without pay. The court has concerns about the credibility

27  of all of the individuals who were part of DRI, and the testimony of Conetto and Catlett has been

28  accepted in some respects and rejected in others. See CACI 5003 ("if you think the witness

1    testified untruthfully about some things but told the truth about others, you may accept the part

2    you think is true and ignore the rest"). Under these circumstances, evidence of empty boasting

3    about Thomas bringing home enormous emeralds from Brazil has no value at all.

4          As to all of the statements emphasized by Thomas, it must be remembered that

5    admissions are merely evidence, to be considered and weighed with all other evidence presented

6    at trial. They are not conclusive, and even proven admissions may be disregarded in favor of

7    other evidence that the trier of fact finds more persuasive. E.g. <u>Frankenheimer v. Frankenheimer</u>

8    (1964) 231 Cal.App.2d 101, 110; <u>Lewetzow v. Sapiro</u> (1961) 188 Cal.App.2d 841, 847; 1

9    Witkin, <u>Cal. Evid.</u> (5th ed.) Hearsay §92. That is what the court has done here:  Thomas'

10   evidence about admissions was weak, conflicting and unpersuasive, and the court has relied on

11   other credible and convincing evidence in making its findings.

12   **Thomas' claim is barred by the statute of limitations**

13         Until he joined in this action, Thomas did nothing to assert ownership rights to the Bahia

14   Emerald. Thomas testified that Ribeiro and Saraiva told him in late 2001 that the emerald would

15   be shipped to him by Federal Express. But when he failed to receive the Bahia Emerald, Thomas

16   took no action.  He did not send Ribeiro and Saraiva any emails, faxes or letters asking why the

17   emerald had not been delivered; he did not send any kind of written demand, insisting that they

18   comply with their obligation to deliver the emerald; he did not go to Sao Paulo to investigate; he

19   did not file a claim or make any kind of written or oral inquiry with Federal Express or any other

20   shipping company; he did not file a claim or make any kind of written or oral inquiry with the

21   Brazilian government or any other agency in Brazil; he did not file a claim or make any kind of

22   written or oral inquiry with the United States government or any other agency in this country.

23         Thomas testified that he suspected that Catlett may have been involved in the

24   disappearance of the Bahia Emerald, and he met with a representative of the Santa Clara District

25   Attorney's Office in early 2002 to discuss the possibility of a criminal action against Catlett and

26   DRI. In March 2002 Thomas also had a casual meeting with his friend Ronald Brooks, who has a

27   background in law enforcement. Thomas said he told Brooks that the Bahia Emerald had been

28

Decision following Trial

RJN258

1    stolen from him in Brazil, and as a favor Brooks agreed to call others in law enforcement and ask

2    them to keep an eye out for a large emerald.

3        But throughout the period, Thomas admits that he filed no claims and took no action to

4    assert his claim of ownership. He did nothing until joining this proceeding on January 26, 2009.

5        Thomas' failure to assert his claim of ownership speaks volumes about his poor

6    credibility. Would a person who truly purchased a multi-million dollar emerald simply shrug off

7    its loss without an investigation, written demand, or claim? Wouldn't the true owner at least pick

8    up the telephone and make some calls? Thomas was asked about this issue repeatedly during

9    trial, and his responses were completely unconvincing.

10        Thomas' failure to act does not just reflect on his poor credibility. It also means that his

11    ownership claim is barred by the statute of limitations.

12        There is no statute of limitations which specifically addresses an action to quiet title.

13    Courts therefore examine the plaintiff's theory of relief underlying a quiet title claim to

14    determine which statute of limitations applies. E.g. Muktarian v. Barmby (1965) 63 Cal.2d 558,

15    560; Leeper v. Beltrami (1959) 53 Cal.2d 195, 213-214.

16        Thomas' theory of relief is that the Bahia Emerald was stolen from him in late 2001. His

17    First Amended Complaint alleges that he has been the rightful owner of the emerald since

18    October 17, 2001 [FAC filed 3/9/2010 at ¶26], and "beginning in late 2001, Conetto and Catlett,

19    in agreement with Ruy [Saraiva] and Elson [Ribeiro], decided not to deliver the Bahia Emerald

20    to Thomas, but rather to retain it" [¶63; accord ¶30 (fall 2001 or shortly thereafter), ¶50 (fall

21    2001), ¶55 (late fall 2001)]. The FAC alleges a cause of action for recovery of possession of

22    personal property based upon this theory of relief [¶¶25-28].

23        An action for taking or detaining personal property, including specific recovery of

24    property, is governed by a three year statute of limitations. Code Civ. Proc. §338(c)(1). The three

25    year period applies to all forms of unlawful taking of personal property. Lowe v. Ozmun (1902)

26    137 Cal. 257, 259; Bell v. Bank of Calif. (1908) 153 Cal. 234, 242. It is the general rule that a

27    cause of action accrues when the wrongful act is done, despite the plaintiff's ignorance of the

28    cause of action. E.g. Menefee v. Ostawari (1991) 228 Cal.App.3d 239, 245; Howe v. Pioneer

Decision following Trial

1   Mfg. Co. (1968) 262 Cal.App.2d 330, 340. Courts have historically applied that rule to Code

2   Civ. Proc. §338(c), holding that a cause of action for conversion of personal property accrues at

3   the time of the unlawful taking. E.g. Bennett v. Hibernia Bank (1956) 47 Cal.2d 540, 561;

4   Harpending v. Meyer (1880) 55 Cal. 555, 561; Coy v. E.F. Hutton (1941) 44 Cal.App.2d 386,

5   390.

6       Under this rule, Thomas had three years from "late 2001" to file his action, and the

7   statute of limitations on his claim ran out in late 2004. He did not file anything in court until

8   January 26, 2009, and his claim for recovery of the Bahia Emerald is therefore barred by the

9   statute of limitations.

10      Citing Naftzger v. American Numismatic Society (1996) 42 Cal.App.4th 421, Thomas

11  has argued that the delayed discovery rule postpones the accrual of his claim. Naftzger held that

12  a cause of action for the return of stolen property "accrued upon the owner's discovery of the

13  identity of the person in possession of the stolen property" and not when the theft occurred. 42

14  Cal.App.4th at 426. The delayed discovery rule adopted by Naftzger does not change the result:

15  Thomas' claim is still barred by the three year statute of limitations under §338(c).*

16      That is because Thomas knew all the relevant facts in late 2001, and there was nothing

17  for him to discover before asserting a legal claim. In late 2001 Thomas knew exactly who held

18  the Bahia Emerald and where it was located. The emerald was held by Ribeiro and it was under

19  Ribeiro's control in Sao Paulo, Brazil – just as it was when Thomas had last seen the emerald in

20  October 2001. Because Thomas had all the information that he needed, his claim accrued in late

21  2001 and the statute of limitations ran in late 2004. See Bono v. Clark (2002) 103 Cal.App.4th

22  1409, 1433 (statute of limitations ran because the plaintiff knew about the property in question

23  and knew who held the property).

24      Moreover even under the delayed discovery rule, Thomas had an obligation to

25  investigate the facts. The Supreme Court has repeatedly held that the delayed discovery rule,

26

27  * The parties have presented extensive argument as to whether the statute of limitations was postponed by the
delayed discovery rule under Code Civ. Proc. §338(c)(2), which applies to an item of "historical, interpretive,

28  scientific, or artistic significance." Because §338(c)(2) incorporates the same delayed discovery rule as Naftzger, it
is not necessary to address this provision; the result is the same.

Decision following Trial                                                            33

whenever it applies, incorporates the principle of constructive notice. As the Court held in <u>Fox v.</u> <u>Ethicon Endo-Surgery Inc.</u> (2005) 35 Cal.4th 797, 809-10: "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused  must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." Accord <u>Jolly v. Eli Lilly & Co.</u> (1988) 44 Cal.3d 1103, 1111("So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her."); see also <u>Orkin v. Taylor</u> (9th Cir. 2007) 487 F.3d 734, 741-42 (applying delayed discovery rule to CCP §338(c)).

To investigate the location and circumstances of the Bahia Emerald in late 2001, all Thomas had to do was ask his colleague Mackell. She was working on the arrangements for storing the emerald, and could have told Thomas exactly where it was located and who was holding it at any point in time. Or Thomas could have asked Ribeiro, the owner of the emerald with whom he had recently shared a Thanksgiving dinner. Ribeiro could have given Thomas the same information. Instead, in 2002 Thomas broke off from his business associates and began to manufacture his unbelievable story.

If Thomas had truly believed that he purchased the Bahia Emerald and had been wrongfully denied possession, his remedy was to assert his rights in court. He could have sued to enforce a purchase agreement in an action for breach of contract and replevin against Ribeiro (see Comm. Code §2716), or he could have asserted claims against Catlett, Conetto, Ribeiro and Saraiva for conversion and other torts (such as those which he has alleged in this action). Thomas certainly knew where to find the courthouse and how to file a lawsuit; in April 2002 he promptly sued DRI and Catlett to collect on his promissory note that had become due only four months earlier [Ex 188].

By delaying his claims, Thomas has caused serious prejudice to the defendants. If Thomas had promptly sued, Ribeiro and the others could have presented fresh evidence in response to his claims, and they could have demanded production of the key records which

1  Thomas now claims to have lost. Instead, Thomas waited more than eight years to assert his

2  claim of ownership for the Bahia Emerald, and much of the evidence has become stale and

3  muddled. Under these circumstances, it is certainly appropriate to apply the statute of limitations

4  and the related doctrine of laches to bar Thomas' claim.

5                                        **DISPOSITION**

6          Respondents Morrison and Armstrong and Intervenor Downie are entitled to an

7  interlocutory judgment in their favor, denying Thomas' claim of ownership to the Bahia Emerald

8  and dismissing with prejudice the First Cause of Action of Thomas' First Amended Complaint.

9          Pursuant to CRC 3.1590(c)(1) this tentative decision is the Court's statement of decision,

10  subject to any party's objections or requests for modification under CRC 3.1590(g). Counsel for

11  Respondents Morrison and Armstrong shall prepare and submit the interlocutory judgment.

12

13  DATED:        January 29, 2014

14

15

16

17                                     Michael Johnson
                                        Superior Court Judge

18

19

20

21

22

23

24

25

26

27

28

Decision following Trial                                                    35
                                                                            RJN262

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

**FILED**
Superior Court of California
County of Los Angeles

**MAY 28 2015**

Sherri R. Carter, Executive Officer/Clerk

By_____ Deputy
Paul Solis

| | |
|---|---|
| KEN CONETTO BY ERICK KITCHEN, HIS ATTORNEY IN FACT,<br><br>       Petitioner,<br><br>  v.<br><br>KIT MORRISON AND TODD ARMSTRONG,<br><br>       Respondents.<br><br>AND RELATED ACTIONS. | BS118649<br><br>TENTATIVE DECISION & STATEMENT OF DECISION FOLLOWING TRIAL OF CLAIM BY THE MORRISON PARTIES |

Trial in this matter was conducted on May 14, 2015 in Department 56 of this Court, Judge Michael Johnson presiding. Respondents/Intervenors Kit Morrison, Todd Armstrong, Jerry Ferrara, Market Link Inc. and FM Holdings Inc. (collectively the "Morrison Parties") were represented by Browne Greene and Andrew Spielberger. The Court has considered all evidence, the briefs and argument of counsel, and it now issues the following decision.

## PROCEDURE

This is an in rem proceeding to determine ownership of the Bahia Emerald, which is reputedly one of the world's largest and most valuable raw emerald stones. In December 2008 the Los Angeles County Sheriff's Department seized the Bahia Emerald as potentially stolen property, and it has maintained custody of the emerald through the present.

The legal proceedings began on January 14, 2009 when a petition for return of the Bahia Emerald was filed by Kenneth Conetto, by Eric Kitchen as Conetto's attorney in fact. In his petition, Conetto alleged that he was the owner of the Bahia Emerald. He named Kit Morrison

RJN263

and Todd Armstrong as respondents, and alleged that they too claimed an ownership interest in the emerald. Conetto petitioned the Court to release the Bahia Emerald, alleging that the parties had settled their claims to the emerald and the Court should return the emerald to him pursuant to Penal Code §1536.

Beginning in spring 2009 a number of parties filed complaints in intervention, asserting ownership interests in the Bahia Emerald and alleging various causes of action against others. Among those who filed complaints in intervention were Anthony and Wendi Thomas, Mark Downie, Larry Biegler, Wayne Catlett, Dave Fisher, Dave Porter and Gemworks Mining Inc. Jerry Ferrara, FM Holdings Inc. and Market Link Inc., who are related to the original respondents Morrison and Armstrong, joined them as parties and the Morrison Parties have jointly litigated their interests.

The case was initially assigned to Judge John Kronstadt. After extensive pre-trial proceedings, the case was set for trial beginning in September 2010. Judge Kronstadt ordered bifurcation of each party's ownership claim, reserving other causes of action for later proceedings. Because the ownership claim of Anthony and Wendi Thomas occurred earliest in time, a separate court trial of the Thomas claim was held first.

Trial of the Thomas claim before Judge Kronstadt was held during 8 days in late 2010 and early 2011. On April 9, 2011 Judge Kronstadt issued a statement of decision that rejected Thomas' ownership claim and ruled in favor of the other parties. A few days after issuing the decision, Judge Kronstadt left the Superior Court and became a federal judge. The case was then assigned to this Court, and Thomas moved for an order declaring a mistrial and striking Judge Kronstadt's decision. On January 27, 2012 the Court granted the motion, based upon the well-settled principle that (unless the parties stipulate otherwise) a mistrial must be granted when the judge who conducted the first phase of a bifurcated court trial is no longer available to hear subsequent phases of the trial. E.g. Guardianship of Sullivan (1904) 143 Cal. 462, 467; European Beverage v. Superior Ct. (1996) 43 Cal.App.4th 1211, 1214-15; Rose v. Boydston (1981) 122 Cal.App.3d 92, 97.

Following additional pre-trial proceedings, the case was set for re-trial in October 2013. By that time only three sets of parties asserted ownership interests in the Bahia Emerald: Intervenors Anthony and Wendi Thomas, Intervenor Mark Downie, and the Morrison Parties. After re-examining the issue, the Court again ordered bifurcation of the parties' claims and conducted a trial on Thomas' cause of action for recovery and possession of the Bahia Emerald.

The Court proceeded under the guidance of the quiet title standards of Code Civ. Proc. §§760.010 et seq.; particularly §760.020(a), which authorizes an action "to establish title against adverse claims to real or personal property." After conducting a 20-day trial on the Thomas claim in October and November 2013, the Court issued a Statement of Decision on January 29, 2014, ruling against Thomas. On February 19, 2014 the Court entered an Interlocutory Judgment in favor of the Morrison Parties and Intervenor Mark Downie, denying the claim of ownership by Anthony and Wendi Thomas and dismissing with prejudice their first cause of action for possession of personal property. On May 29, 2014 the Court granted an unopposed motion for judgment on the pleadings addressed to Thomas' remaining claims, and Judgment of Dismissal was entered as to all causes of action in the Thomas complaint.

On October 14, 2014 the Court granted the Morrison Parties' motion for summary adjudication against Downie. The Court ruled that Downie could not establish his claim of title to the Bahia Emerald as a matter of law, but that Downie could proceed on his claim that he has a lien against the emerald, securing an unpaid debt. Following the October 14, 2014 ruling, the Morrison Parties reached a settlement with Downie, who is no longer participating in the proceedings.

On March 30, 2015 the Court denied a motion to dismiss or stay the proceedings under Code Civ. Proc. §389(b), made by the Federative Republic of Brazil. In connection with that motion Brazil claimed ownership of the Bahia Emerald, but it asserted sovereign immunity and has chosen not to participate in these proceedings.

Because all other parties and claims were eliminated, the Morrison Parties appeared alone at the May 14, 2015 trial. Applying Code Civ. Proc. §764.010, the Court required the Morrison Parties to present evidence to establish their claim of title to the Bahia Emerald. During the trial,

RJN265

the Morrison Parties presented the live testimony of 6 witnesses, submitted deposition testimony by 5 witnesses, and introduced 35 exhibits into evidence. In making its factual determinations in this decision, the Court has considered the evidence and argument presented during the May 14, 2015 trial, the Thomas trial in 2013, and all other proceedings in the case.

## FACTS

### Bahia Emerald and Renata Joias

The Bahia Emerald is a solid black schist with nine protruding emerald crystals. It weighs 341 kilograms (751.77 pounds); its base measures 760 by 670 millimeters (29.92 by 26.38 inches); and its irregular height ranges from 500 to 850 millimeters (19.69 to 33.46 inches). It was discovered and mined in the Pindobacu Municipality, State of Bahia, Nation of Brazil, by employees of Renata Joias Embalagens Ltda. ("Renata Joias").

Elson Alves Ribeiro is the majority owner and managing director of Renata Joias. He has extensive experience in the mining industry and has spent most of his life mining, buying and selling emeralds, diamonds and similar stones. Renata Joias is a family-owned mining company based in Limeira, Brazil. During the case, Ribeiro has been referred to as "Elson," "Ribeiro," and one of "the Brazilians." In this decision, he will be called "Ribeiro."

Ruy Saraiva Filho is a key employee of Renata Joias. He has worked with the company since 1987, and he essentially operates as Ribeiro's close assistant. Like Ribeiro, Saraiva has spent most of his life mining, buying and selling emeralds, diamonds and similar stones. During the case, Saraiva has been referred to as "Ruy," "Saraiva," "Filho," and one of "the Brazilians." In this decision, he will be called "Saraiva."

Ribiero and Saraiva both testified that the Bahia Emerald was properly mined and registered under Brazilian law. Renata Joias was a registered mining company under Brazilian law, and Ribeiro lawfully registered the Bahia Emerald after it was extracted. Ribeiro also paid an interstate transfer tax for shipping it from the State of Bahia to the State of Sao Paulo in 2001 [Ex. 14]. The Court has taken judicial notice of applicable Brazilian law (the constitution, statutes, ordinances and court rulings), which state that mining a stone like the Bahia Emerald

RJN266

within the Pindobacu Municipality, State of Bahia, by a registered mining company was legal in 2001 [Ex. 1-13]. Carlos Derraik, a mining law expert from Brazil, testified that he reviewed the evidence and considered the Brazilian laws which were in effect in 2001. Derraik concluded that the Bahia Emerald was legally mined and transported under Brazilian law, and the Court found his testimony persuasive.

**Involvement with DRI**

Ribeiro and Saraiva have known and done business with an American named Kenneth Conetto since the 1980s. Conetto is a mining consultant who lives in northern California. In 2001 Ribeiro and Saraiva were traveling in the United States, selling emeralds and conducting other business. They visited Conetto in northern California, and he introduced them to people who might be interested in buying emeralds. One of the people that Ribeiro and Saraiva met through Conetto was Anthony Thomas, a building contractor who lived in northern California. Thomas referred and introduced Ribeiro and Saraiva to jewelers and others who might purchase emeralds or engage in other business transactions. One of the people that Ribeiro and Saraiva met through Thomas was Wayne Catlett. In 2001 Catlett was CEO and majority shareholder of Digital Reflections Inc. ("DRI"), a start-up company in northern California engaged in the development of digital imaging technology.

In the fall of 2001, Catlett, Thomas and Conetto traveled to Brazil for meetings with Ribeiro and Saraiva. Catlett and Thomas had a plan to use cut and polished emeralds as collateral for a complicated "high yield" loan transaction for DRI. The "high yield" transaction was never completed with cut and polished emeralds, but Catlett and Thomas learned of the Bahia Emerald and made efforts to use it as collateral in the DRI financing scheme. Ribeiro cooperated with their effort; the Bahia Emerald remained in Ribeiro's possession in Brazil from 2002 through 2004 while Catlett tried to put together the "high yield" transaction for DRI.

**Renata Joias Transfer to GMI Panama**

In August 2004 Gemworks Mining Inc. of Panama ("GMI Panama") was created in order to establish a corporate entity which would own and control the Bahia Emerald for the purpose using it as collateral for DRI's "high yield" transaction. Eric Kitchen, a Santa Barbara lawyer

who had represented Catlett, was retained to help form GMI Panama. There were four ownership shares issued by GMI Panama: one each to Ribeiro, Saraiva, Conetto and Catlett; essentially creating a four way partnership. Catlett was granted a Power of Attorney to conduct many different types of business transactions for GMI Panama, including selling or pledging the Bahia Emerald [Ex. 38].

On August 31, 2004 Ribeiro signed an Assignment and Bill of Sale, conveying and transferring "all rights title and interest" in the Bahia Emerald from Renata Joias to GMI Panama [Ex. 15]. Ribeiro and Saraiva both acknowledged this transfer of ownership in their testimony.

**GMI Panama Joint Venture Agreement**

In August 2004 GMI Panama entered into a Joint Venture Agreement with The Waltel Foundation, a foundation run by William Manak and Lauren Nowell [Ex. 16]. The purpose of the Joint Venture Agreement was to bring about a "high yield" transaction involving the Bahia Emerald, with the loan proceeds paid to the four shareholders of GMI Panama (Ribeiro, Saraiva, Conetto and Catlett) and the principals of Waltel (Manak and Nowell).

In Article 4 of the Joint Venture Agreement, GMI Panama agreed to transfer the Bahia Emerald to the Waltel Foundation if the "high yield" transaction was consummated [Ex. 16]. Successful completion of the "high yield" transaction was therefore a condition precedent to transfer of the emerald to the Waltel Foundation.

**GAM Holding Company**

Around January 2005 Catlett, Ribeiro and Saraiva decided to ship the Bahia Emerald to the United States, and to retain Attorney Eric Kitchen to oversee the process. To facilitate the transfer, they formed an American corporation on behalf of GMI Panama, solely to maintain custody of the Bahia Emerald for the anticipated "high yield" transaction. The corporation was called Gemworks Asset Management Inc. ("GAM"), which was created as a holding company for the Bahia Emerald in place of the Waltel Foundation. Catlett was the President and CEO of GAM, and Manak and Nowell were officers. No shares of stock were issued by GAM, as it was merely a holding company for the Bahia Emerald in anticipation of the "high yield" transaction.

In February 2005 Kitchen transported the Bahia Emerald to San Jose, California, where it was stored in a vault under the supervision of Conetto and Catlett. On April 14, 2005 GMI Panama issued an Assignment and Bill of Sale of the Bahia Emerald to GAM [Ex. 17]. This assignment was conditional and contingent upon successful completion of the "high yield" transaction.

On July 27, 2005 the Bahia Emerald was shipped from San Jose to a facility in New Orleans, Louisiana. Catlett testified that the "high yield" transaction was nearing completion when Hurricane Katrina hit New Orleans on August 29, 2005. The hurricane flooded a good part of the city, including the facility where the Bahia Emerald was stored. The emerald was flooded and inaccessible for an extended period of time, causing the ever-elusive "high yield" transaction to fall through.

Because the "high yield" transaction failed, the condition precedent for conveyance of the Bahia Emerald from GMI Panama to Waltel or GAM also failed, and the conveyance never occurred. On April 27, 2007 GMI Panama rescinded the April 14, 2005 Assignment and Bill of Sale of the Bahia Emerald to GAM [Ex. 19]. This cancelled the April 14, 2005 instrument, terminated the conditional interest of GAM, and left clear title of the Bahia Emerald with GMI Panama.

**GMI Panama Authority to B & B Services**

Having finally lost all confidence that a "high yield" transaction would occur, GMI Panama attempted to arrange an outright sale of the Bahia Emerald. On August 22, 2007 Catlett, on behalf of GMI Panama, entered into an agreement with Larry Biegler on behalf of his company B & B Services Inc. Under the terms of the agreement, B & B Services received authority to possess and sell the Bahia Emerald for the one-year period of August 22, 2007 through August 22, 2008 in return for 50 percent of the sale proceeds [Ex. 20]. The agreement between GMI Panama and B & B Services was also memorialized in a written Assignment of Asset, signed on August 22, 2007 by Catlett on behalf of GMI Panama [Ex. 21]. In his testimony, Catlett authenticated both agreements and acknowledged the authority of B & B Services to sell the Bahia Emerald on behalf of all owners.

RJN269

After execution of the agreements between GMI Panama and B & B Services, the Bahia Emerald was returned from New Orleans to San Jose. It was stored at a facility in San Jose and overseen by Conetto on behalf of B & B Services.

**B & B Services Authority to Ferrara**

Beigler had a close business relationship with Jerry Ferrara. The two worked together with various investment projects, involving construction, real estate finance, distressed properties, and gemstones. In connection with these projects, Ferrara developed valuable contacts with potential investors. After he acquired an interest in the Bahia Emerald on behalf of B & B Services, Biegler enlisted Ferrara to find a buyer or investor for the emerald.

On April 3, 2008 B & B Services transferred the Bahia Emerald to Ferrara, with an agreement to equally share in the sale proceeds for the emerald [Ex. 22]. Before entering into this agreement, Ferrara demanded documents establishing good title for the emerald. Biegler provided Ferrara with documents establishing the chain of title from Ribeiro and Renata Joias through B & B Services, along with appraisals that had been received for the Bahia Emerald. Ferrara was satisfied from these documents that B & B Services had good and valuable title to the emerald.

After entering into this transfer agreement, Ferrara, Biegler and Conetto moved the Bahia Emerald to a secure storage facility in El Monte, California.

**Transfer to Morrison**

In 2008 Ferrara developed a relationship with Kit Morrison as a potential investor for Ferrara's projects with Biegler. Morrison acquired investment capital through successful work in the construction, excavation and property development fields. Morrison worked primarily through his company, Market Link Inc.

In May 2008 Ferrara offered to sell Morrison a large quantity of rough uncut diamonds that Biegler was acquiring from Brazil [Ex. 23]. As a term of the offer Morrison was required to pay $2 million in advance, before the diamonds would be acquired and available for inspection. Morrison balked at this requirement and refused to pay any money in advance. Ferrara responded with a counter-offer that involved the Bahia Emerald: Morrison would pay $2 million as required

by the offer for the diamond deal, and his payment would be secured by the emerald. If Biegler

did not acquire and produce the diamonds, Morrison would keep the Bahia Emerald.

Before entering into this transaction, Morrison conducted a due diligence review of title

to the Bahia Emerald. Ferrara provided Morrison with documents establishing the chain of title

from Ribeiro and Renata Joias through B & B Services and Ferrara, as well as appraisals for the

emerald. Morrison reviewed the documents himself, and he had them reviewed by Todd

Armstrong, a part owner of Market Link who had a background in banking and accounting.

Armstrong in turn called Market Link's business attorney, William Dean, for advice in

structuring the transaction and ensuring that Ferrara had good title to the emerald. As part of his

due diligence review Armstrong called Eric Kitchen, the attorney who had been continually

involved with the Bahia Emerald since the formation of GAM in January 2005. Kitchen assured

Armstrong that the chain of title and appraisal documents were genuine and that Ferrara had

good and valuable title to the Bahia Emerald.

Based on their review, Morrison, Armstrong and Dean were all satisfied with Ferrara's

chain of title to the emerald. On June 2, 2008 Ferrara executed an Assignment and Bill of Sale

for the Bahia Emerald, stating that he "sells, assigns and transfers" the emerald to Morrison, on

the condition that Morrison pay $2 million as a binding partial payment on the diamond

transaction with Ferrara and Biegler [Ex. 24]. On June 4 through 10, 2008 Morrison and Market

Link paid $1.3 million to Ferrara [Ex. 26]. Upon receipt of the funds, Morrison and Ferrara

entered into an Amendment to Assignment and Bill of Sale, reciting that Ferrara had received the

funds, which were secured by the assignment of the Bahia Emerald to Morrison and Market

Link; and upon Biegler's receipt of the diamonds, Morrison would pay the balance to Ferrara

[Ex. 25]. The amended agreement confirmed that Morrison and Market Link would receive full

title to the Bahia Emerald if Biegler did not receive the diamonds:

> "In the event that Jerry Ferrara is unable to provide satisfactory
>
> proof of the diamond or emerald parcels as agreed to in the original
>
> Assignment and Bill of Sale as executed on June 2, 2008, Market
>
> Link Inc. will be considered to have fulfilled all obligations with

RJN271

respect to any and all agreements between the parties.

Furthermore, Market Link Inc. will take full title and interest in the

collateral of the agreement between the parties without further

financial consideration." [Ex. 25 at ¶ 3]

When Ferrara received Morrison's payment of $1.3 million, he in turn paid money to
Ribeiro, Biegler and Conetto as compensation for their ownership interests in the Bahia Emerald.
Ferrara paid $500,000 to Ribeiro, $344,300 to Biegler, and $105,000 to Conetto [Ex. 26].

Biegler never acquired the diamonds, and the diamond deal between Biegler and
Morrison was never completed. Under the terms of the Assignment and Bill of Sale and the
Amendment to Assignment and Bill of Sale, Market Link therefore became owner of the Bahia
Emerald.

**Creation of FM Holdings Inc.**

Although Market Link acquired full title to the Bahia Emerald through the failure of the
diamond deal, Ferrara asked Morrison to grant him a share of the emerald. Ferrara made two
arguments: 1) that Morrison had gotten a tremendous deal, and 2) that Ferrara could provide
Morrison with valuable assistance in selling the emerald. Morrison found the argument
persuasive, particularly in regard to Ferrara's assistance in finding a buyer. Morrison testified
persuasively that he really had no idea what he would do with the Bahia Emerald. By making
Ferrara a partner, he could avoid litigation and enlist Ferrara's help and expertise in producing a
return for an asset that did not have a ready market.

On June 26, 2008 FM Holdings Inc. was incorporated, with Morrison, Ferrara and
Armstrong as shareholders and officers [Ex. 27]. The following day, June 27, 2008, Ferrara,
Morrison and Market Link conveyed all of their rights, title and interest in the Bahia Emerald to
FM Holdings [Ex. 28 & 29]. FM Holdings continues to hold title to the Bahia Emerald at this
time.

After formation of the new corporation, relevant documents relating to storing and
insuring the Bahia Emerald were placed in the name of FM Holdings [Ex. 30 – 32]. On
September 26, 2008 Morrison and Ferrara removed the emerald from its secure storage facility in

RJN272

El Monte and transported it to Las Vegas, Nevada. They planned to sell the Bahia Emerald and believed that Las Vegas would provide a good location for finding investors and displaying the emerald.

In December 2008 Biegler filed a theft report for the Bahia Emerald with the Los Angeles County Sheriff's Department. Sheriff Detectives located the emerald in Las Vegas on December 19, 2008. When the Detectives contacted Morrison, he provided them with documents showing the chain of title and ownership by FM Holdings. The Detectives nevertheless asked to take the emerald into their custody as potentially stolen property, and Morrison voluntarily surrendered it to them. The Detectives provided Morrison with a receipt for the emerald [Ex. 35]. Although Biegler has abandoned his claim to the Bahia Emerald, the Sheriff's Department has maintained custody of the emerald until the court makes a determination of its owner.

## LEGAL ISSUES

Throughout this action, the Court has proceeded under the guidance of the quiet title standards of Code Civ. Proc. §§760.010 et seq.  Section 760.020(a) authorizes an action "to establish title against adverse claims to real or personal property."  A claim to property is "a legal or equitable right, title, estate, lien, or interest in property or cloud upon title." See §760.010(a). In a quiet title action, the court "shall examine into and determine the plaintiff's title against the claims of all the defendants." See §764.010; 5 Witkin Cal. Procedure (5th ed.) Pleading §653 (An action to quiet title "is used to assert a wide range of interests against an equally wide range of adverse claims. It is available to establish any kind of title or interest, legal or equitable, real or personal property.").

The Court has reviewed the evidence and has found several grounds that fully support FM Holdings' title to the Bahia Emerald.

### Presumed Ownership under Evidence Code §637

FM Holdings, through Morrison and Ferrara, was in sole possession of the Bahia Emerald at the time it was voluntarily surrendered to the Los Angeles Sheriff's Department on December 19, 2008. Evid. Code §637 creates a rebuttable presumption that a person who

Decision following Trial

RJN273

possesses a thing is the owner. See §637 ("The things which a person possesses are presumed to be owned by him."); In Re Horn's Estate (1951) 102 Cal.App.2d 635, 641 ("The law presumes that things which a person possesses are owned by her."); Schuette v. Larson (1941) 44 Cal.App.2d 296, 297 (same). Because there is no evidence to refute the claim of ownership by FM Holdings, the rebuttable presumption of possession is sufficient to support ownership.

**Title from a Sale under Commercial Code §2401**

The evidence also has also shown that Morrison, on behalf of Market Link, paid $1.3 million to acquire the Bahia Emerald. Portions of this money were paid to others who held an ownership interest in the emerald: Ribiero and Renata Joias; Conetto; Biegler and B & B Services; and Ferrara. The agreements between Ferrara and Market Link expressly passed title to the emerald from Ferrara to Morrison and Market Link; and later Morrison and Market Link (as well as Ferrara) transferred title to FM Holdings.

Comm. Code §2401(1) passes title "in any manner and on any conditions explicitly agreed on by the parties". If there is no explicit agreement, then title passes "with reference to the physical delivery of the goods". See §2401(2)(a). For a "sale," Comm. Code §2401 looks to the point when the seller has finally committed himself through "physical delivery of the goods." See Comm. Code §1201 (delivery means "voluntary transfer of possession."). Ferrara physically transferred the Bahia Emerald to Market Link and later it was transferred to FH Holdings. Under §2401 title to the emerald was transferred by the clear agreements of the parties, and title passed at the time of transfer. Through these transfers, title to the Bahia Emerald ultimately came to rest with FM Holdings.

**Title through a Good Faith Purchase under Commercial Code §2403**

California has long recognized the doctrine of title through a good faith purchase for value. See Eversdon v. Mayhew (1884) 65 Cal. 163, 167; Cal. Cured Fruit Assn. v. Stelling (1904) 141 Cal. 713, 719; Virginia Timber v. Glenwood Lumber (1907) 5 Cal.App. 256, 261. This doctrine has been incorporated into Comm. Code §2403, which states in pertinent part that "A person with voidable title has power to transfer a good title to a good faith purchaser for value."

The elements of a good faith bona fide purchase for value are 1) valuable consideration, 2) the absence of notice, and 3) the presence of good faith. See Barthelmess v. Cavalier (1934) 2 Cal.App. 2d 477, 488. All of these elements have been established for the Morrison Parties. Morrison paid $1.3 million to acquire an interest in the Bahia Emerald. Before doing so, he received chain of title records from Ferrara; Morrison, Armstrong and Dean all reviewed the records and conducted independent research; Armstrong interviewed Eric Kitchen, who was continually involved with the emerald and vouched for its clear title; and all of the relevant participants – Morrison, Armstrong and Ferrara – held a good faith belief that they had sound title to the Bahia Emerald.

Under these circumstances, the Morrison Parties acquired title as good faith purchasers for value, and clear title was passed to FM Holdings.

**Title through a Purchase from Authorized Agents**

Based upon actual and ostensible agency legal principles under Civil Code §2337 and §2338, FM Holdings also acquired legal title to the Bahia Emerald through a series of valid agency agreements from GMI Panama through B & B Services and Ferrara. In these agreements, each participant authorized the other to sell the Bahia Emerald in return for a share of the proceeds. Section 2337 states in pertinent part that "An instrument within the scope of his authority by which an agent intends to bind his principal, does bind him if such intent is plainly inferable from the instrument itself."

That is what the evidence has established here. GMI Panama authorized B & B Services to sell the Bahia Emerald, and B & B Services in turn authorized Ferrara to do so. Ferrara then entered into transfer agreements with Morrison and Market Link, and Ferrara ultimately confirmed the transfer to FM Holdings. Each agency relationship was memorialized in writing, and each agent acted within the scope of the agency agreement. When Morrison paid Ferrara for his interest in the Bahia Emerald, Ferrara shared the proceeds with Ribeiro, Conetto and Biegler. And it is very significant that all of the principals in the emerald's ownership chain – Ribeiro, Saraiva, Conetto, Catlett and Biegler – have been involved in this case, have known about this proceeding, and have not objected to the ownership claim by the Morrison Parties.

RJN275

1   FM Holdings therefore acquired its title to the Bahia Emerald through a valid series of
2   agency agreements.

3

4                                **DISPOSITION**

5          FM Holdings Inc. has presented evidence establishing clear title to the Bahia Emerald as
6   against all other ownership claims. FM Holdings is entitled to judgment in its favor, establishing
7   its title to the Bahia Emerald and dismissing the claims of all other parties with prejudice.

8          Pursuant to CRC 3.1590(c)(1) this is the Court's statement of decision, subject to any
9   party's objections or requests for modification under CRC 3.1590(g). Counsel for FM Holdings
10  shall prepare and submit the judgment.

11

12  DATED:        May 28, 2015

13

14

15                                    _____
16                                    Michael Johnson
                                      Superior Court Judge
17

18

19

20

21

22

23

24

25

26

27

28

Decision following Trial                                                    RJN276

56

ORIGINAL

Browne Greene, Esq.
GREENE BROILLET & WHEELER, LLP
100 Wilshire Boulevard, Ste. 2100
Santa Monica, CA 90407
Tel: (310) 576-1200
Fax: (310) 576-122

**Received**

JUN 01 2015

**Filing Window**

Andrew J. Spielberger, Esq.
Daniel K. Balaban, Esq.
BALABAN & SPIELBERGER LLP
11999 San Vicente Boulevard, Suite 345
Los Angeles, CA 90049
Tel: (424) 832-7677
Fax: (424) 832-7702 LOS ANGELES SUPERIOR COURT
RECEIVED

JUN 08 2015

Attorney for Respondents

**DEPT. 56**

(COURT FILING STAMP ONLY)

**FILED**
Superior Court of California
County of Los Angeles

JUN 23 2015

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
        Paul Solis

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

| | |
|---|---|
| KEN CONETTO BY ERIC KITCHEN HIS ATTORNEY IN FACT,<br><br>                              Petitioner,<br><br>                    vs.<br><br>KIT MORRISON AND TODD ARMSTRONG,<br><br>                              Respondents.<br><br>_____<br><br>AND RELATED CASES. | CASE NO. BS 118649<br>[Assigned to Hon. Michael Johnson, Dept. 56]<br><br>(Petition Filed: 1/14/09)<br><br>~~[PROPOSED]~~ JUDGMENT<br><br>**BY FAX** |

        Trial in this matter was conducted on May 14, 2015, in Department 56 of the Los

Angeles Superior Court, the Honorable Michael Johnson presiding. Respondents Kit Morrison,

Todd Armstrong, Jerry Ferrara, MarketLink, Inc. and FM Holdings, Inc. were represented by

Browne Greene and Andrew J. Spielberger. After considering all the evidence, the briefs and

ADOPTS ITS 5/28/2015 STATEMENT OF DECISION AND FURTHER
argument of counsel, the Court hereby finds, rules and Enters Judgment that FM Holdings, Inc.

acquired and has title to the Bahia Emerald on the basis that FM Holdings, Inc. met its burden of

proof that it acquired title to the Bahia Emerald pursuant to the legal presumption found in

1

1 | Evidence Code Section 637; and pursuant to a sale and purchase under California Commercial

2 | Code Section 2401; and pursuant to being bona fide good faith purchasers under California

3 | Commercial Code Section 2403; and pursuant to agency legal principles under Civil Code

4 | Sections 2337 and 2338 wherein FM Holdings Inc. acquired legal title to the Bahia Emerald

5 | through a series of valid agency agreements.

6 |        NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that

7 | Respondents Kit Morrison, Todd Armstrong, Jerry Ferrara, Market Link, Inc. and FM Holdings,

8 | Inc. are entitled to Judgment and that Judgment is hereby Entered that FM Holdings, Inc. has

9 | legal and equitable title to the Bahia Emerald.

DATE: June **23**, 2015      By: _____

                  The Honorable Michael Johnson

                  Superior Court Judge

2

[PROPOSED] JUDGMENT

RJN278

## PROOF OF SERVICE
(C.C.P. 1013A, 20015.5)

**STATE OF CALIFORNIA**
I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 11999 San Vicente Boulevard, Suite 345 Los Angeles, CA 90049.

On June 1, 2015 I served the foregoing documents described as:  **[PROPOSED] JUDGMENT** on the interested parties in this action.

☒     By placing the true copies thereof enclosed in sealed envelopes addresses as stated on the attached mailing list.

☒     **BY MAIL** - per the service list attached.
As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐     **BY ELECTRONIC MAIL:**

☐     **BY FEDERAL EXPRESS** - per the service list attached.

☐     **BY PERSONAL SERVICE** - I caused to be delivered such envelope by hand per the service list attached.

☐     **BY FACSIMILE** - I faxed a copy of the above-described document to the interested parties as set forth on the attached mailing list.

Executed on June 1, 2015 at Los Angeles, California.

☒     **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Laura Vargas
Name                                                        Signature

Proof of Service
1

RJN279

## Service List

Kenneth Conetto et al v. Kit Morrison, et al
Case No. BS 118649

Browne Greene, Esq.
GREENE, BROILLET & WHEELER, LLP
100 Wilshire Boulevard, Suite 2100
P.O. Box 2131
Santa Monica , CA 90407-2131
Tel.: (310) 576-1200
Fax: (310) 576-1220
e-mail: bgreene@greene-broillet.com
        sdempsey@greene-broillet.com
Co-Counsel for Respondents

Steven Haney, Esq.
HANEY & YOUNG, LLP
1055 West 7th Street, Suite 1950
Los Angeles, CA 90017
Tel: (213) 228-6500
Fax: (213) 228-6501
e-mail: shaney@haneyyoung.com
Counsel for Mark Downie

Anthony Thomas
Wendi Thomas
7725 Peavine Peak Court
Reno, NV 89523
Tel: (408) 640-2795
In Pro-Per

Jerry Kaplan, Esq.
Joan Kenegos, Esq.
Kaplan, Kenegos & Kadin
9150 Wilshire Blvd., Suite 175
Beverly Hills, CA 90212

Proof of Service
2

RJN280